STATE v. CHARLES H. TIEDT, Appellant.—No. 40330.—206 S. W. (2d) 524.

Court en Banc, December 8, 1947.

*Maurice Pope, Milton Litvak* and *John C. Landis III* for appellant.

116

*J. E. Taylor,* Attorney General, and *Frank W. Hayes,* Assistant Attorney General, for respondent.

[525] LEEDY, J.—Charles Tiedt, the defendant, was convicted of murder in the first degree, in having killed Fred Machette in Buchanan County on November 25, 1945. The jury assessed his punishment at death; judgment and sentence accordingly, and he appeals.

Defendant's home adjoined that of Delbert Machette, a brother of the deceased, Fred Machette. Fred, who did not live in St. Joseph, and had only recently returned from Naval duty, was merely visiting in the city. He was still in uniform. He did not know Tiedt, and Tiedt did not know him. The Tiedt and Machette homes face west, and are located in the 2200 block on Main Street in the City of St. Joseph. The Tiedt house is 10 or 15 feet north of the Machette house. Both are located on a high terrace, with separate steps leading up from the sidewalk below. The building line sets back from the edge of the terrace 10 feet or more. The Machette porch is at the southwest corner of the house. It does not project out from the main walls, and forms an integral part of the main edifice, so that the front room is between the porch and the Tiedt home on the north.

It is not disputed that Fred Machette was shot and instantly killed by defendant as he (Fred) emerged from the front room into the darkness of the porch of his brother Delbert's home at about one o'clock on the night in question. When the shooting occurred, defendant was standing near the edge of the terrace at or near the dividing line between the two properties, with an exterior electric light burning over the Tiedt front door (at his back), thus exposing him to view. Moreover, the evidence showed, as a part of the res gestae, that the brother, Delbert Machette, and the latter's wife, suffered the same fate, and in precisely the same manner, the three killings having taken place in such rapid succession as to constitute, in point of time, the same occurrence. The police, arriving within a few minutes after the shooting, found the bodies; Mrs. Machette's lying on the front porch, and her husband's and Fred's on the sidewalk immediately in front of the porch, the three practically forming a triangle.

Mrs. Loetta Rogers, a resident of Hamilton, Mo., the sole adult survivor of the persons in the Machette home on the night in question, testified that she had gone from Hamilton to St. Joseph with Fred and another person during the afternoon; that after visiting at the home of Don Machette in South St. Joseph, she and Fred went to

Delbert's residence about 8 P. M., where they remained with Delbert and his wife, visiting, until the tragedy occurred; that during the course of the evening they had had two mixed drinks, the last one having been served an hour or an hour and a half before the shooting. She further testified that just before the shooting occurred, the telephone rang, and Mrs. Machette answered it, then handed the phone to her husband. When Delbert hung up the phone, he said to Fred, "There is some shooting going on. Let's go see." Mrs. Machette said, "I am going out, too. You [meaning Mrs. Rogers] watch the kids." The men went first, followed by Mrs. Machette. Just after Mrs. Machette walked out, the witness heard a shot, and then rushed upstairs and stayed with one of the Machette children until the police arrived a few minutes later.

After firing the three shots, defendant ran back into his house, reloaded the gun, and returned to the yard, yelling, according to one of the neighbors, "Come on out, I am out here in front, come on out and get me;" or, as another state's witness put it, "I know you got a loaded .38 in there. Come on out and get me. I am ready to die."

Defendant was the only witness called in his behalf. It appears from his testimony that he is 51 years of age, a veteran of World War I, and the oldest employe, in point of service, in the shop where he has been continuously employed since his return to civilian life; that he has resided in St. Joseph more than 30 years, has a wife, seven children, and one stepchild, five of whom were living at home at the time of the killing; that he owns the home in which he has been living since 1920 or 1921. His hobby or diversion was hunting and fishing, [526] in which he engaged somewhat extensively. Indeed, it was his furtherance of plans for a duck hunting expedition on the morning in question that occasioned his arrival on the scene at the time of the homicide. So much for his background, in the light of which the offense baffles comprehension.

Defendant further testified to two recent difficulties with Delbert Machette (the details being here unimportant are omitted) in which the latter was very angry and threatened defendant, once with a gun. The effect of these encounters was to frighten him, Machette being a larger man. Turning now to his version of the events which immediately preceded, and culminated in, the killing of these three persons: He testified that on returning home sometime after midnight, and as he ran up the steps leading to his house, he heard voices on the darkened Machette porch, and heard Delbert say, "Here comes Tiedt now. I'll get him. I don't like him anyway. When he gets to the top of the steps, I'll get him with this .38." This, he said, excited him, and he ran around to his back door, called his wife, and told her the Machettes wanted to kill him, but he didn't know what for, and he had his wife look up their number. Whereupon he tele-

phoned the Machette residence, Mrs. Machette answering, and the following occurred: "I said, 'You people want to kill me.' She said, 'You're God dam right, you come out in the yard and we'll show you want [what?] we want to kill you for, come on out or we are coming over to get you.'" Stating that he was then "all excited and worked up over it," he got his shotgun out of the closet, grabbed shells from the shelf, and started out in the yard, and the reason he did so was because "they told me to go out or they would come over and get me." Asked if he saw anything in the yard, he replied, "I stepped out in the yard just as one of them stepped out on the porch, in view of the porch, and he said something, and I shot. Q. Why did you shoot? A. I figured they was going to shoot."

On cross-examination he embellished his testimony by saying that as he came up the front steps he also heard a gun click. There were certain inconsistencies between his testimony and the written statement he made to the police the following morning. For example, in the latter (introduced by himself) he stated that "some woman" had answered the phone, but that he thought Machette had grabbed the phone from her. His statement to the police further recites in that connection, "I said 'You get your gun we're going out in the front yard and have it out,' and sure enough he came out." He admitted that after the shooting he went back in the house, re-loaded his gun, and came back out. His explanation was, "I didn't know what they were going to do. I thought they might still come over after me." Asked if he stood there talking and yelling, he replied, "After it was all over, I said, 'You want to kill me, come ahead. I am still here to be killed. I am not afraid to die.'" He admitted consuming a number of beers during the course of the afternoon and evening, and until going home shortly after midnight, but he denied that he was intoxicated.

It is not contended, nor could it be, that the verdict is not supported by the evidence. Therefore, the foregoing facts are deemed sufficient as outlining the general situation with which the prosecuting officers were dealing, and to an appreciation of probable jury reaction to some of the incidents of the trial.

The serious question presented is whether the scope of legitimate argument was transcended by the assistant prosecutor to such an extent as to constitute reversible error. It is a fundamental concept of the criminal law that an accused, whether guilty or innocent, is entitled to a fair trial, and so it is the duty of the trial court, and of prosecuting counsel as well, to see that he gets one, and there must be no conduct by argument, or otherwise, the effect of which is to inflame the prejudices or excite the passions of the jury against him. Witness these precedents: A prosecuting attorney occupies a quasi-judicial position. It is his duty to conduct the trial in such

manner as will be fair and impartial to the rights of the accused. 23 C. J. S., Criminal Law, sec. 1081. It is his duty "not to lay aside the impartiality that should characterize his official actions in order to become a heated partisan," nor engage in vituperation of the prisoner and appeals to prejudice, [527] "or otherwise denounce the accused in an unwarranted and improper way." 53 Am. Jur., Trial, sec. 504. "While sympathy for suffering and indignation at wrong are worthy sentiments, they are not safe visitors to the court room. They may not enter the jury box, nor be heard on the witness stand, nor speak too loudly through the voice of counsel." Ibid., sec. 496. Prosecuting "officers should . . . avoid injecting into the minds of the jury any matter which is not proper for their consideration, or which would add to the prejudice which the charge itself has produced in their minds." State v. Horton, 247 Mo. 657, 153 S. W. 1051, 1054. "It makes no difference how regular the proceedings at the trial are, if prejudice finds. its way into the verdict, that verdict cannot stand." State v. Webb, 254 Mo. 414, 434, 162 S. W. 622, 628. See, also, State v. Jones, 249 Mo. 80, 155 S. W. 33; State v. Burns, 286 Mo. 665, 228 S. W. 766; State v. Connor, (Mo.) 252 S. W. 713; State v. Dixon, (Mo.) 253 S. W. 746; State v. Leonard, (Mo.) 182 S. W. (2d) 548; 9 West's Mo. Digest, Key Nos. 699-724, 730; People v. Fielding, 158 N. Y. 542, 46 L. R. A. 641; Annotation, 78 A. L. R. 1438-1541; State v. Haney, 23 N. W. 2d 369.

■ We have examined the state's argument wherein reference was made to the two children of Mr. and Mrs. Delbert Machette, which was objected to as improper because not an issue, the defendant being then on trial for the killing of Fred, and not Delbert. It is manifest that the statements complained of were retaliatory in nature, and had been invited by the improper argument of defendant's counsel as to the Tiedt children. An attorney for defendant cannot provoke a reply to his own improper argument, and then claim error.

■ The objectionable features about to be noticed are given emphasis, and more fully appreciated when considered upon a reading of the argument as a whole, as we have done. The eloquent and forceful assistant prosecuting attorney who closed for the state, in exhorting the jury to inflict the death penalty, argued thus:

"MR. STIGALL: This sailor he killed out of sheer love of killing . . . After he makes it three out of three, he quickly reloads and stands there begging for more squirrels, more game, more ducks, more blood, more fine murder. When he was led away from that scene that night, he was still unsatisfied, still yearning for gore, *and he is here now, unsatisfied, still yearning. All he needs is just an opportunity . . .*"

Counsel for defendant here interrupted, and stated his objection to the argument as being prejudicial, inflammatory and not sup-

ported by the evidence, which the court sustained, and instructed the jury to disregard the statement.

The prosecutor continued, *"Everyone in this court room is a potential victim of his murderous desire,"* and was again interrupted. The court's ruling was: "I don't think that is legitimate argument, objection sustained." Notwithstanding this ruling, the prosecutor (obviously referring to his last preceding statement that everyone in the court room was a potential victim of defendant's murderous desire), added, "Because the most innocent person in this court room has done as much to him as had this innocent sailor, this blameless mother's son." A few sentences further on in his argument he speculated on whether defendant "had not reasoned with his *criminal mind* . . . 'I will get only a prison sentence at most, the administration will change and a new governor or penal board with meager knowledge of the facts will pardon me or parole me.' He has a feeling somewhere along the line that he will escape the death chamber and then he will be on his way to freedom." Recurring, then, to the line of argument previously held improper, he said, "The first jump he has got to make is over this jury of Buchanan County citizens, drawn from the body of our stalwart people, and because of that I am forcibly goaded to say that if this man can escape the gas chamber, then Homma, the Jap, should have escaped it, the bloody butcher of France should have escaped it. If he can escape it, then who should get it? *What have the good people of the county done that they should be continually under the hazard that would be created by leaving him alive?"*

This was objected to as prejudicial and inflammatory, and sustained. Undeterred [528] by the court's ruling, the prosecutor continued, *"As long as he lives there will always be the possibility of his repeating, on some flimsy excuse, this dire happening, over some dark mistake, that again on some quiet night in the midst of similar circumstances, or similar situation, there is a possibility that gun will repeat its deadly work."* Here followed another objection, on which the ruling was: "I think we should discuss what Mr. Tiedt has done and not what he might do in the future."

Still persisting, the prosecutor continued, "Experience has told us. We do not have to conjecture what might happen when we turn a man loose on the community . . ." This was interrupted by the court saying, "My position is the same. Objection sustained . . . The jury is instructed to disregard that portion of the argument. The objection will stand."

Still further persisting, we find the prosecutor resuming his argument thus: *"I am sure you gentlemen don't want to see again in this community innocent citizens and innocent people struck down by a murderer, their blood spurting from their bodies into the gutter*

122

. . . " Objection was renewed, and overruled. Having thus triumphed through his insistence, the prosecutor then made this re- vealing statement to the jury: *"Gentlemen, I do not know of any language too strong to suit this case."*

We do not agree. The references to again seeing innocent citizens and innocent people of the community struck down by a murderer, their blood spurting from their bodies into the gutter was highly and patently inflammatory, irrelevant to any issue, and had no place in a case of this sort. It would not be sanctioned even in a civil case. See Chawkley v. Wabash R. Co., 317 Mo. 782, 808, 297 S. W. 20, 30, where the portrayal of the gruesome and horrifying nature of the scene of the casualty there in question was held to be reversibly erroneous. Having thrice sustained objections to the same line of improper and prejudicial argument, the court should have ruled likewise on the last objection. The state seeks to sustain the latter ruling on this single ground: Says the brief, "Nothing is contained in what he said which can be construed as referring to the fact that appellant would commit another murder if he was not adequately punished." We cannot assent to such a narrow interpretation of the language used, particularly when it is taken in connection with that which immediately preceded it.

Consequently, we are not concerned with an instance of a single breach arising more or less spontaneously under the stress and excitement of contest. If such were the case, the court's first ruling would doubtless have served to divert the speaker, and to counteract the prejudice. But repeated and persistent indulgences of the character here involved, in flagrant disregard of the court's rulings, dispel any idea of inadvertence, and present the question of the cumulative effect of such improprieties, coupled with an erroneous ruling of approval. The situation calls for the application of authorities declaring that the sting remains after the objection is sustained, as in State v. Webb, supra, where it was concluded that counsel "for the State had sunk his fangs deep into the life blood of the defendant—too deep for the poison to be withdrawn," and remanded the case for another trial; or, as some of the cases say, that the difficulty with such "remarks . . . frequently repeated is that one by one they will locate a feeling in the minds of the jury it is impossible to eradicate." Schotis v. North Coast Stevedoring Co., 163 Wash. 305, 1 Pac. 2d 221, 78 A. L. R. 1427 (and annotation thereto, supra); McSweyn v. Everett, 136 Wash. 202, 239 Pac. 205.

Note the striking similarity between the argument here and the Kentucky case of Berry v. Commonwealth, 13 S. W. 2d 521. It, too, was a capital case, and, in a lengthy opinion disposing of some fifteen assignments of error, it was reversed and remanded on the sole ground that the following argument constituted reversible error:

"Send him to the penitentiary : . . and in a few years some soft-hearted Governor will pardon him *and turn him loose on society to kill somebody else.*"

Even where the fact of an accused's former convictions and incarcerations for felonies actually committed by him is before the jury, it is, nevertheless, not a legitimate subject of argument on the question of the [529] infliction of the death penalty. State v. Jackson, 336 Mo. 1069, 83 S. W. 2d 87, (and cases there cited) so holds. Reversal resulted, notwithstanding the trial court commuted the sentence to life imprisonment. While the principle of that case, and those it cites, is not precisely that here involved, nevertheless the analogy is strong.

Moreover, part of the argument[1] is susceptible to the construction that unless defendant be punished capitally, the lives of the jurors themselves were actually imperiled. It may be said in passing that there were other, and not altogether infrequent, instances of overstepping of bounds in the closing argument. They are not necessary to be noticed, because not objected to, but they do highlight its general tenor. To illustrate: In his peroration the prosecutor told the jury, "there is only one way to make this punishment complete . . . one way to do your duty," called for "united courage *and patriotism,*" and invoking "the Heavenly Host to whom mothers have prayed through the years for the safety of their sons," reinforced his argument with this exhortation to fraternal instinct, "*Comrades,* let's go, let's go." The italicized words indicate rather clearly what we have in mind. Another example (appearing in the excerpts quoted) is the comparison of defendant with "Homma, the Jap, and the bloody butcher of France." The counterpart of such argument [reference to "Beasts of Belshen" coupled with other improper matter] was held to be reversibly erroneous in Commonwealth v. Balles, 160 Pa. Super. 148, 50 Atl. 2d 729. See, also, State v. Houston, (Mo.) 263 S. W. 219, and Cole v. State (Okla.), 175 Pac. 2d 376.

The details of this crime, as shown by the state's evidence, were so savagely brutal as to naturally arouse and inflame the emotions. It is inferable from record facts, including the number of prospective jurors who had formed opinions based solely on rumors or newspaper accounts, that the community had been stirred by the crime, which, even under defendant's version taken at face value, appears to have been shockingly wanton and vicious. Nothing developed in the course of the trial which might reasonably be thought to place the accused in a favorable light. These intangible elements necessitated all the

---

[1]"*Everyone in this court room* is a potential victim of his murderous desire . . . We do not have to conjecture of what might happen when we turn a man loose on the community."

more restraint on the part of the prosecuting officers [State v. Richardson, 349 Mo. 1103, 1115, 163 S. W. 2d 956; State v. Guerringer, 265 Mo. 408, 178 S. W. 65], for in a matter so grave as urging in argument considerations affecting the exercise of the jury's discretion to choose between punishing capitally or imposing a life sentence, inflammatory appeals to arouse bias and hostility toward defendant, or to engender fear of personal safety in the minds of the jurors, cannot be sanctioned; and this is true whether the offending argument is due to mere overzealousness (as in this case), or to an improper and conscious purpose to gain an unfair advantage over the accused, the result being the same in either case. In the absence of such argument, and on the proof adduced, the jury might reasonably have been expected to assess adequate punishment.

■ The court did not err in refusing to strike the answers of two witnesses (neighbors) to the effect that they heard "groans" or "rasping sort of breathing" immediately following the shooting. This was admissible as part of the res gestae and defendant's limited admission that "Fred Machette, the deceased, came to his death as a result of a gunshot wound in the right side of the body" did not render it inadmissible.

■ Complaint is made that the court erred in permitting the witness, Bierle, to testify that on the corner concrete blocks of the house there were several fresh scratches, which showed the pattern of coming from a shotgun. It is objected that this was a conclusion of the witness who had not qualified as an expert, and, therefore, invaded the province of the jury. In view of defendant's testimony in which he detailed the manner in which the killing occurred, and his firing of the three shotgun shells, we see no possibility of any resulting prejudice, and so disallow the contention.

■ [530] Because the case must be remanded for another trial, we have examined the complaints urged against the instructions, although they were not properly preserved by motion for new trial. Those calling for comment are Nos. 7 and 9, which we undertake without having the benefit of the state's views touching either instruction. No. 7, on the question of transferring felonious intent from the object of accused's design to the victim, should be omitted, unless a more substantial factual basis for its application is developed. See State v. Batson, 339 Mo. 298, 96 S. W. 2d 384. To obviate any question as to whether No. 9 improperly limits the right of self-defense because of the omission to define or explain the clause "the right of self-defense does not imply the right to attack," it should be redrafted to conform to the views expressed in State v. Daugherty, (Mo.) 196 S. W. 2d 627; State v. Williams, 337 Mo. 884, 892, 87 S. W. 2d 175, 179, 100 A. L. R. 1503; State v. Ball, (Mo.) 262 S. W. 1043, 1045; and State v. O'Leary, (Mo.) 44 S. W. 2d 50.

Other assignments sufficiently preserving questions for review are unnecessary to be noticed because the matters complained of are not likely to recur upon another trial.

The judgment must be reversed, and the cause remanded. It is so ordered. All concur.