STATE of Missouri, (Plaintiff)
Respondent,

v.

Jerome Joe PRUITT, (Defendant)
Appellant.

No. 56600.

Supreme Court of Missouri,
En Banc.

May 8, 1972.

John C. Danforth, Atty. Gen., Neil Mac-Farlane, Asst. Atty. Gen., Jefferson City, for respondents.

Eugene K. Buckley, Jerry D. Perryman, Evans & Dixon, St. Louis, for appellant.

HOLMAN, Judge.

The indictment in this case charged defendant with the offense of murder in the first degree. It was alleged that he shot and killed Lynda Walker on February 6, 1970. A trial resulted in a verdict of guilty and the death penalty was assessed. See §§ 559.010 and 559.030.[1] Defendant has appealed.

Defendant does not question the sufficiency of the evidence to make a submissible case and hence a brief statement of facts will suffice. On the date of her death Lynda was 26 years old, had been married eight months, and was employed as a nurse at Desloge Hospital in St. Louis. She had driven to work that day in a new Oldsmobile "Cutlass." The events in question occurred shortly after 4 p. m. as she was leaving work. According to a verbal statement given by defendant, "on Friday, February 6, he was in the company of Ronald Gunn, Melvin Vinson, and Calvin Burks, and they were in Melvin Vinson's car which is a white 1960 Chevrolet;

---

1. Statutory references are to RSMo 1969, V.A.M.S.

that Calvin Burks had mentioned that he formerly worked at Firmin Desloge Hospital and was familiar with the paydays and the habits of the nurses and other employees there, and they were going there to snatch some purses. When they got to the area of the hospital, he and Calvin Burks got out of the car; that Melvin Vinson and Ronald Gunn were to ride around the block and wait for them; and then they saw this lady getting into her automobile. They ran up and told her this was a stick-up, and Burks got in [the car] first, pushing the lady to the right front passenger seat, Burks taking the middle front seat, and Pruitt getting behind the wheel; that as he drove off the lady started screaming and opened the door and tried to get out, and this is when Calvin Burks shot her. They then pushed her out of the car and they drove off. He gave Burks the purse, and Burks got out. He assumed that Burks was going to catch a cab, and he drove the car back to the area of Pendleton and North Market where he saw the police car coming and he got out of the car and left it at the curb. * * * He said that there was [in the car] a white box with a nightgown in it and a cigarette lighter that he had given to his girl friend, Dorothy Cardwell."

After obtaining the statement the police secured a search warrant and went to the home of defendant's mother where they seized a pair of trousers from defendant's room. In a pocket of the trousers they found car keys which operated the ignition, trunk, and door locks of the car which deceased had been driving. The gown was also recovered from Dorothy Cardwell.

Ronald Gunn, an occupant of the Vinson car, testified for the State. He stated that after defendant and Burks left the Vinson car, they continued to drive around and about two minutes later he saw a lady fall out of a car; that the car was an Oldsmobile Cutlass and as it passed them he saw Burks driving it and that defendant was in the back seat; that at the time defendant left the Vinson car he saw a .22 caliber re-

volver under his belt; that later that night he heard defendant say he had some rings, and that after they were both arrested he saw defendant sell a ring to an inmate-clerk at the jail; that on Saturday, February 7, he called the police department and told them all he knew about the murder, including the names of those involved.

In connection with the foregoing it should be stated that the evidence indicated that Lynda was killed by a bullet from a .22 caliber weapon and that her wedding and diamond rings were missing. Other facts will be stated in connection with some of the points hereinafter discussed.

The first three points briefed by defendant are referred to generally in the contention that "the court erred in overruling the defendant's motion to suppress evidence and to suppress those statements allegedly made by the defendant, and all evidence acquired as a result of the searches of the defendant's home for the reason that defendant's arrest was unlawful." More specifically, it is said that defendant's arrest was without a warrant or probable cause and therefore all items thereafter seized, or statements obtained, were products of the unlawful arrest and should have been suppressed under the doctrine stated in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

Defendant was arrested by Officer Adkins on February 7. At that time he was in a 1953 Chevrolet being driven by Willie Vinson. The arrest was for stealing the Walker automobile. The information possessed by Adkins at that time was (1) an unnamed lady informant had stated that she had seen that Chevrolet near the abandoned Walker car, (2) Booker Watson had called the police when he saw persons stripping the Walker car in front of his home (before the police arrived these persons left in a Chervolet which was similar to the one above mentioned), and (3) another unnamed person had advised the officer that he had seen defendant driving the Walker car.

■ "The existence of probable cause for an arrest must necessarily depend upon the facts of each particular case. 'The existence of "probable cause", justifying an arrest without a warrant, is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. It is a pragmatic question to be determined in each case in the light of the particular circumstances and the particular offense involved.' 5 Am.Jur.2d, Arrest, § 48, p. 740." State v. Seymour, Mo.Supp., 438 S.W.2d 161, 163. Although the evidence need not be as substantial as that required to support a conviction, probable cause does require a reasonable ground for belief of guilt. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879. And, we are mindful that there is considerable doubt as to the weight that may be given to information received by the police from undisclosed or anonymous informants. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L. Ed.2d 637.

It should be again mentioned that on the day defendant was arrested Ronald Gunn called the police and related all he knew about the Walker murder, which would have included the fact that defendant left the scene in her (deceased's) car. It does not appear that Officer Adkins had that information at the time of the arrest, but we note that in the recent case of United States v. Stratton, 8th Cir., 453 F.2d 36, the court stated: "We think the knowledge of one officer is the knowledge of all and that in the operation of an investigative or police agency the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause. The arresting officer himself need not possess all of the available information."

■ We have concluded that the information obtained by the police was sufficient to constitute probable cause which warranted the arrest of defendant without a warrant. It is our view that this case may be distinguished from *Aguilar* and *Spinelli* upon the facts involved. While we do not desire to restate the facts, it is significant that two of the informants had seen defendant in the recently stolen car. That fact, together with the other information in the hands of the police, was, as stated, sufficient to justify the arrest.

Shortly after his arrest defendant was questioned by the police. At that time he denied any knowledge concerning Lynda's death. He stated, however, that on February 6, at about 5 p. m., "he met some unknown Negro male, and he purchased some clothing, overnight bag, a long clothing bag, for fifteen dollars, I believe it was; and that this clothing bag contained several women's dresses, and he sold these dresses about taverns to several women." Thereafter the officers went to the home of defendant's mother. After advising her that her son was in trouble they asked if they could "look around" and she said "Okay." Mrs. Pruitt then took the officers to Jerome's room where they found a black leather glove which resembled one found in the Walker car. They also found two luggage tags with the name "Lynda Scheppers" (deceased's maiden name) on them. Defendant contends that "a valid, intelligent consent to search was not given and hence the items which the ensuing search revealed" should have been suppressed and excluded.

■ It is our view that Mrs. Pruitt had authority to consent to the search and that the trial court was warranted by the evidence in finding that such consent was intelligently and voluntarily given. See State v. Gailes, Mo.Sup., 428 S.W.2d 555, and State v. Anderson, Mo.Sup., 384 S.W. 2d 591 [12, 13]. The case relied upon by defendant, State v. Witherspoon, Mo.Sup., 460 S.W.2d 281, is clearly distinguishable upon the facts. We accordingly rule that the trial court did not err in overruling the motion to suppress this evidence.

Defendant next contends that the court erred in overruling his motion to quash the

search warrant and to suppress the evidence obtained by its use. It is said that the search warrant was invalid because the affidavits filed to obtain it were fatally defective because they contained a statement that was untrue. The statement said to be untrue is that defendant had told the affiants that when he abandoned the Walker car he "took the items from the car to his home." Defendant's basis for asserting that the statement is untrue is that the police report, which purports to contain an oral statement of defendant, says that defendant stated that he gave two items to Dorothy Cardwell and "sold the other articles he took from the car to various women sitting in taverns." The affidavits in question also contain statements concerning articles found at the Pruitt home when a search was made on the previous Saturday.

■ The affidavits appear to be sufficient and valid on their face and there is no contention to the contrary. We have concluded that the foregoing conflict was not sufficient to invalidate the search warrant. Neither party has cited any authority directly in point. We think it should be noted, however, that defendant may have made a number of statements to the police other than the one appearing in the police report. Moreover, neither of the affiants were examined about the conflict and therefore were not given an opportunity to explain the situation. Also, the fact that the affidavits contain other facts tending to support the issuance of the search warrant lends support to the ruling of the trial court. As indicated, we rule this point against defendant.

■ A sample of blood was taken from the body of deceased by Dr. Criscione, the coroner's physician. Miss McKnight, a police serologist, testified that tests showed it was the same type as the blood on certain articles that had been in the possession of defendant. Defendant contends that the court erred in admitting that evidence because the sample taken from deceased was not properly identified. We find no merit

in that contention. Dr. Criscione testified that he delivered the sample to a police officer from the laboratory. Officer Reeder stated that he received the blood from Dr. Criscione and delivered it to the laboratory where it was turned over to Miss McKnight. Miss McKnight testified that she received the sample (identified as to origin) from Reeder. We rule that there was sufficient proof of the chain of identification. See State v. Anderson, supra, 384 S.W.2d 591[30].

■ The trial court admitted in evidence a white sweater, red wallet, and blue purse found in deceased's car. Defendant contends that such was error because they were not shown to belong to Mrs. Walker or connected in any manner to defendant. The State concedes that the items were erroneously admitted but asserts that no prejudice resulted therefrom. We agree. There was nothing inflammatory about the items and since they were not shown to be related to defendant in any way they had no probative value and could not have prejudiced his case. We accordingly rule that this error does not require a reversal. State v. Moore, Mo.Sup., 353 S.W.2d 712[6].

■ The defendant next contends that certain statements made by the assistant circuit attorney during argument constituted a reference to his failure to testify in violation of certain constitutional provisions and S.Ct. Rule 26.08, V.A.M.R. (the same as § 546.270). The portions of argument complained of are: "Is that all the evidence you have concerning that confession? That's every word of it, isn't it? There isn't a word that's said that this fine — * * * Is there one bit of evidence in this case that says anything to the contrary? * * * But I do know this one thing—the defense is free to call witnesses that it chooses. Any witnesses it wishes. * * * I'll tell you another rule of the Court, too. Where the defense or the plaintiff, either side, doesn't call a witness, you can presume that the evidence they

would give you would be unfavorable." Objections on the ground indicated were made and overruled and, in one instance, a motion for mistrial was denied.

We rule this point contrary to defendant's contention. There is no direct reference to defendant's failure to testify. In each instance the reference is to the failure of the defense to offer evidence. In State v. Hutchinson, Mo.Sup., 458 S.W.2d 553, we held that statements of that kind did not violate the applicable constitutional, statutory, and rule provisions. Defendant has asked that we reconsider the soundness of the ruling in *Hutchinson.* We have done so and find no reason for overruling that decision.

Defendant also contends that "the trial court erred and abused its discretion in failing to declare a mistrial, on motion of defendant, by reason of the individual and cumulative effect of the inflammatory and prejudicial argument of the assistant circuit attorney." The statements complained of are divided into two groups, i. e., one in which the court overruled the objections, and the other where the objections were sustained. The statements in the first group are: "The body is dropped in the street, and there she is thrown as if she were no more important than the silhouette which was marking the spot on which she bled her last. * * * How about these three little boys who perhaps think that this is a hero in the neighborhood, and they know what he did. * * * Are you going to condemn them to a life like his by slapping him on the wrist or letting him get away with what has been a willful and wanton murder, or are they going to be told that—" The statements to which objection was sustained are: "I don't think the age of Lynda Walker is of any particular importance, nor the fact that her parents are deprived of ever having grandchildren or her husband is left wifeless. * * * And he tells you he gave that to her. Reminds you a great deal, does it not, of the Roman soldiers rolling dice for Christ's garments. * * * And they sit

around until three o'clock in the morning, drinking and carrying on. And is he crestfallen? 'The broad is dead, so what? * * * And I say that if we don't do something, then we're subjecting ourselves and our children, I presume our children's children, to a life of terror, a life of anarchy, and a life where any man may do whatever he wishes if he's stronger. * * * And I say it demands it now because I think that the chains of the tyranny that these people are trying to put on us are being forged, and we will have fighting in our streets right at this minute. * * * And I say your choice is this: If there is a life to be forfeited here, you must select—is it that man's life, or is it the life of these little children, and of yourselves, and of the rest of this community." In a number of instances the court was asked to instruct the jury to disregard the statement and the court did so. A number of motions for a mistrial were made and denied.

In our consideration of this point we should have in mind that "a prosecuting attorney is generally permitted considerable latitude in arguing the necessity of law enforcement and the responsibility resting on juries. State v. King, Mo., 334 S.W.2d 34, 40[10]. The prosecuting attorney has a right to call attention to the prevalence of crime in the community (crime rate), to urge the jury to do its duty and uphold the law, and to draw inferences from conditions resulting from failure to uphold the law." State v. Elbert, Mo.Sup., 438 S.W.2d 164, 166. And that "the declaration of a mistrial is, as stated, a drastic remedy and should be exercised only in extraordinary circumstances where the prejudicial effect can be removed in no other way. See State v. Smith, Mo., 431 S.W.2d 74; State v. James, Mo., 347 S.W.2d 211; State v. Camper, Mo., 391 S.W.2d 926. This determination rests largely within the discretion of the trial judge who observed the incident and can best gauge its prejudicial ef-

fect upon the jury." State v. Raspberry, Mo.Sup., 452 S.W.2d 169, 173.

We have concluded that the trial court did not err in overruling the objection to the two statements in the first group. The silhouette mentioned in the first statement was a reference to one appearing in a photograph showing where the body was found. While that statement is in colorful language we do not consider it inflammatory or prejudicial. The second statement was clearly a reference to the result of failure to assess an adequate punishment, which was not improper.

As indicated, the court sustained objection to each statement in the second group and when requested instructed the jury to disregard it. If defendant had desired other relief, short of a mistrial, he could have requested that the assistant circuit attorney be reprimanded, but he did not do so. The question for our decision therefore is whether the trial court abused its discretion in failing to grant the drastic remedy of a mistrial. We think not. Defendant relies primarily on State v. Tiedt, 357 Mo. 115, 206 S.W.2d 524, as authority for reversal. We do not consider that case to be applicable because the language used there was much stronger than in the case at bar and in some instances the court overruled objection to obviously inflammatory language. In the case before us the court indicated to the jury that the statements were improper by sustaining the objections. We do not believe, however, that the statements were of such an offensive and inflammatory nature that it may be said that the court abused its discretion in denying the motion for a mistrial.

Defendant has briefed the contention that the death penalty constitutes cruel and unusual punishment and therefore violates the Eighth and Fourteenth Amendments to the Constitution of the United States. Our disposition of this case makes it unnecessary to rule this point. Those interested in our previous decisions on that issue may examine Duisen v. State, Mo.Sup., 441 S.

W.2d 688, and State v. Coleman, Mo.Sup., 460 S.W.2d 719.

The final contention of defendant is that "the trial court erred in excusing for cause, on motion of the State and over objection of defendant, jurors who, while expressing reservations about the death penalty, did not unambiguously and in unmistakably clear terms indicate that they would automatically vote against the imposition of the death penalty no matter what the trial might reveal or that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt."

Defendant relies primarily on Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776; Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221; and Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433. We quote rather extensively from *Witherspoon*, as follows: "The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Nor does it involve the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them." 391 U.S. 513, 88 S.Ct. 1772. * * * "The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to

support only a narrower ground of exclusion." 391 U.S. 522, n. 21, 88 S.Ct. 1776. * * * "Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." 391 U.S. 516, n. 9, 88 S. Ct. 1774. * * * "[W]e hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. 522, 88 S.Ct. 1776.

■ It was made clear in *Maxwell* that the attitude of the venireman must appear in unmistakably clear language. Questions concerning the death penalty as to what the prospective juror *might* do, and equivocal answers such as "I think I do," or "Yes, I am afraid I do," will not support a challenge for cause. And on June 28, 1971, the Supreme Court of the United States reversed the death penalty in 21 cases by memorandum opinion, citing *Witherspoon, Boulden,* and *Maxwell.* See 29 L. Ed.2d pp. 855–859, inclusive [403 U.S. 946–948, 91 S.Ct. 2273, 2277, 2278, 2279, 2280, 2281, 2282, 2283, 2284, 2286, 2287, 2288, 2289, 2290, 2291,]. An examination of the reported state court cases involved will demonstrate that the court is adhering strictly to the rule that the disqualification of the venireman must appear unambiguously and with unmistakable clarity. For example, see Wilson v. State, Fla., 225 So.2d 321[8]; State v. Funicello, 52 N.J. 263, 245 A.2d 181; Turner v. State, Tex. Cr.App., 462 S.W.2d 9; and Jaggers v. Commonwealth of Kentucky, Ky., 439 S. W.2d 580.

Defendant complains that four prospective jurors were improperly challenged for cause. We have decided that the court erred in excusing venireman Everding and hence we need not extend this opinion by reciting the examination of the other three.

When the panel was questioned about a certain newspaper article Mr. Everding made the following response: "I read the article but didn't form any conclusion. The only thing, I'm afraid I'm against the death penalty." Thereafter the following appears: "Mr. Darst: If you are convinced under the law and the evidence of the guilt of the defendant—I'm not asking you, I'm not asking anybody to promise until they hear the evidence—but if you were convinced, would you be able to vote it, knowing the death penalty was a possibility, could you vote the verdict that you honestly believed in? Mr. Everding: I would be doubtful. * * * Mr. Darst: I want to make my challenge at this time, that we strike Mr. Everding for cause. Mr. Buckley: I would object to that challenge for cause because I don't believe it has been shown that Mr. Everding would be unable to pass upon the question of guilt or innocence because of his feelings as to the death penalty. As I recall his answer, the most he said it was somewhat doubtful, and I don't believe it's been shown sufficiently to excuse him for cause."

■ As we have indicated, the cases heretofore cited require that before a venireman can be excused because of his views on the death penalty he must state unequivocally either that he cannot make an impartial decision as to defendant's guilt, or that he will refuse to consider imposing the death penalty. The most that can be said concerning Mr. Everding's views is that he was *afraid* he was against the death penalty and was *doubtful* about his ability to vote a verdict of guilty (even if convinced thereof) because the death penalty was a possibility. Those equivocal and ambiguous answers were not sufficient to warrant the sustention of the State's challenge in view of the strict rule heretofore stated. It follows that the judgment, insofar as it imposes the death sentence, must be reversed. Witherspoon v. Illinois, supra.

As indicated, we rule that there was no reversible error in the trial of the issues relating to defendant's guilt.

The judgment is reversed and the cause remanded with directions to the trial court to resentence the defendant to life imprisonment unless the State shall elect to retry the defendant—in which event the trial court shall order a new trial upon all issues.

FINCH, C. J., and DONNELLY, MORGAN, and HENLEY, JJ., concur.

BARDGETT, J., dissents in separate dissenting opinion filed.

SEILER, J., dissents in separate dissenting opinion filed, and concurs in separate dissenting opinion of BARDGETT, J.

SEILER, Judge (dissenting).

On the matter of what amounts to the prosecutor's commenting on the failure of the defendant to testify, since we are reconsidering State v. Hutchinson (Mo.Sup. banc) 458 S.W.2d 553, I would overrule the Hutchinson decision and would not approve still another of these arguments where the prosecutors say one thing but everybody knows they mean another—namely, "I hope you will note that the defendant has not testified in his defense." As predicted in Hutchinson, prosecutors have accepted our permissive assurance it is safe to make this appeal so long as they do not use a meat-ax approach. Witness these post-Hutchinson examples: ". . . The police officers, their testimony . . . is undisputed, unrefuted and undenied . . .", in a case where defendant did not testify, approved, State v. Bibbs (Mo.Sup.) 461 S.W.2d 755 and ". . . his [defendant's] turn then. Nothing . . . Counsel had no evidence at all . . . You heard no evidence put on by this counsel here . . .", in a case where defendant did not testify, approved, State v. Huddleston (Mo.Sup.) 462 S.W.2d 691.

The present decision provides another weapon for the prosecutor's already well stocked arsenal on how to argue to the jury, without penalty, that defendant has not taken the witness stand: do it by asking the jury to apply the rule that if the defendant does not call any witnesses, the jury can presume the evidence the witness would give would be unfavorable. In order to apply this rule, the jury must remind itself, as the prosecutor urges it to do, that the defendant has not testified.

Our decisions permitting the prosecutor to comment on the failure of the defendant to testify are at the expense of the constitutional right of the defendant not to incriminate himself. This right is too important to the people to water it down in order that prosecutors can make more effective arguments. As the law is applied in Missouri criminal trials today, the defendant must decide whether he will forego his right not to testify, or pay the price of having it argued to the jury that his silence means he is guilty.

I would also give a new trial in this case because of the inflammatory argument comparing defendant's conduct to the soldiers casting dice for Christ's garments on the cross, along with the accompanying arguments set forth in the majority opinion. As was stated in State v. Tiedt, banc, 357 Mo. 115, 206 S.W.2d 524, 528–529, what occurred here ". . . calls for the application of authorities declaring that the sting remains after the objection is sustained . . ." In this case, as in Tiedt, ". . . in a matter so grave as urging in argument considerations affecting the exercise of the jury's discretion to choose between punishing capitally or imposing a life sentence, inflammatory appeals to arouse bias and hostility toward defendant . . . cannot be sanctioned . . .", and, "In the absence of such argument, and on the proof adduced, the jury might reasonably have been expected to assess adequate punishment." There was no justification for resorting to over-kill in the case before

us and our tacit approval of it sets a bad precedent, in my opinion.

I therefore dissent. I do not reach the other points covered in the main opinion.

BARDGETT, Judge (dissenting).

I respectfully dissent. Since the Court en Banc is reconsidering the soundness of the Court's ruling in State v. Hutchinson, Mo., 458 S.W.2d 553, in which I concurred in the dissenting opinion of Seiler, J., I desire to state that, in my opinion, the statements made by the prosecutor in State v. Hutchinson, supra, and in the instant case both constituted a comment on the defendant's failure to testify.

Additionally, however, the prosecutor in the instant case went one step beyond State v. Hutchinson, supra, and told the jury that it could indulge in the affirmative determination that, by reason of the failure of the defense to call witnesses, there arose a presumption against the defendant that "the evidence they (defendant's witnesses) would give you would be unfavorable." Had the prosecutor said to the jury, "Now you will notice that the defendant did not testify in this case", and ended there it would clearly be a naked comment on the defendant's failure to testify and violative of the applicable Constitutional provisions as well as § 546.270, V. A.M.S., but, insofar as its practical effect upon the jury is concerned, would not be as devastating as to tell the jury, as they were told here, that, under the rules of the Court, the jury can presume that "Where the defense * * * doesn't call a witness, you can presume that the evidence they would give would be unfavorable." The broad statement includes within its ambit the defendant, for if he testifies he is a witness. This statement by the prosecutor left nothing to the imagination, and authorized the jury to make an affirmative presumption that if the defendant testified in the case his testimony would be adverse to his own interest and favorable to the prosecution.

In my opinion, the statement by the prosecutor not only was a comment on defendant's failure to testify but improperly shifted to the defendant the burden of going forward with evidence in order to rebut the affirmative unfavorable presumption which the jury was authorized by the prosecutor's statement to utilize in arriving at a verdict in this case.

This was a horrible killing, and I would not suggest that a prosecutor diminish his zeal in advocating the cause of the State in this or any other case in order that a just verdict be rendered. Nevertheless, no attorney representing any party can be allowed to violate the basic charter adopted by the people and by which the people govern themselves, to wit: Amendments 5 and 14, Constitution of the United States, Article 1, § 19, Constitution of Mo.1945, V.A. M.S., as well as Sec. 546.270 V.A.M.S. With all due respect to the majority opinion in this case, I believe that the Constitutional and statutory provisions, supra, were violated in this case, and that this constituted prejudicial error for which this case should be reversed and remanded for new trial.

In the absence of the majority's adopting the foregoing as decisive of this case, I wish to state that I am in agreement with the disposition the majority opinion makes of this case based on the error appearing as a result of the violation of the requirements of Witherspoon v. Illinois, cited in the majority opinion.