**STATE of Missouri, Respondent,**

v.

**Thomas PFLUGRADT, Appellant.**

No. KCD 28903.

Missouri Court of Appeals, Kansas City District.

Oct. 31, 1977.

Downs & Pierce, John E. Downs, St. Joseph, for appellant.

John D. Ashcroft, Atty. Gen., Nanette Laughrey, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

ANDREW JACKSON HIGGINS, Special Judge.

Appeal from conviction by a jury of exhibiting a deadly weapon in a rude, angry, or threatening manner. The questions are whether the court should have declared a mistrial because of a venireman's comment during voir dire; and whether the court should have given an instruction on common assault. Affirmed.

Appellant does not question the sufficiency of evidence to sustain his conviction. His statement of facts demonstrates a case of exhibiting a deadly weapon in a rude, angry, or threatening manner as charged and submitted under Section 564.610 RSMo 1969:

On July 18, 1975, at 9 p. m., Thomas Pflugradt and his wife, Brenda, were present at Fox's Tavern in a predominantly black neighborhood at 18th and Messanie, St. Joseph, Missouri. Defendant, a beer truck driver-salesman, as part of his employment, engaged in promotional activity with reference to the retail establishments that he served. On the evening in question, he was wearing his uniform.

Defendant and his wife left the table at which they had been sitting and went to a pool table for about fifteen minutes. Upon returning to their table, defendant's wife discovered that some money and keys she

had left on the table were missing. The keys were for defendant's car and homes of the families of defendant and his wife. Distressed by the disappearance of the keys, defendant approached Doyle Rucker, an off-duty policeman who was present in the bar. Conversation with Officer Rucker occurred at approximately 9:30 p. m. Rucker did not assist defendant in locating the missing keys but suggested that defendant call a police squad car and report the missing keys. He further suggested that defendant search for the keys in the restroom trashcans.

Defendant and his wife left the tavern at approximately 10 p. m. and went home, where he obtained a shotgun. They then proceeded to the home of a friend, Danny Wolfe, who, with one Mike Hogan, returned with defendant and his wife to the tavern. Upon their arrival, defendant entered the tavern with his shotgun and made a demand (in abusive, vulgar, and degrading language) to the tavern patrons for the return of his keys. Defendant thereafter fired the shotgun into the ceiling of the tavern.

Fred Moore, one of the patrons at whom the gun was pointed, was sitting at the bar at about 11 p. m. when Thomas Pflugradt entered the tavern with a gun and demanded his keys, after which Moore left the tavern. Before his departure, Moore was "looking right down the barrel" and described the gun as a single-barrel gun with a "shiny part." With respect to defendant's demand for his keys, Moore said that defendant "wasn't talking to nobody in particular," but was talking to "everybody that was in the place."

After his exit from the tavern, Moore stopped to report the incident to off-duty police officer Rucker who was then outside the tavern in a nearby parked car, then proceeded to a nearby house to call the police. Moore was unable to gain admittance to the house and did not call the police, but Rucker did go to the same house later and called the police station.

Immediately after the shot was fired defendant's wife left the car in which she, defendant, Wolfe, and Hogan had arrived, went into the tavern and found her husband. Both then left the tavern and were apprehended by police officers before they reached their car.

Defendant testified that he threw his shotgun into the weeds behind the tavern before being arrested.

Officer Rucker had seen defendant and his wife leave the building after the shot was fired and walk west from the tavern with a shotgun in his hand. They then went around the corner of the building. Almost immediately, two police cars arrived; Rucker sent the arriving officers after the defendant. Rucker next saw one Tony Gannaway appear from around the east side of the building with a shotgun, which was retrieved by Rucker after pursuit and a "tussle," during which the gun discharged. Rucker had no personal knowledge of the manner in which Gannaway gained possession of the gun taken from Gannaway, but stated it was the same gun that defendant had previously had.

Appellant contends the court erred in denying his motion for mistrial during voir dire "because of an inflammatory, prejudicial and unsubstantiated charge made by venireman Parker in the presence of the entire venire from which the jury was chosen."

This contention arises from the following portion of the voir dire examination of venireman Daniel Parker:

"Q [by Mr. Insco for the State] Do you think the fact that you are close in age to Mr. Pflugradt would make it difficult for you to sit as a juror here and assess his punishment? A No. But I don't believe— The more I look at him, I believe I know him. I mean, I don't know him, personally, but I have seen him. Q Well, how do you know him, do you think? A Well, it could be—I think I have witnessed something similar to what he has been accused, but it

wasn't at that place. Q Where was that? A The Swan Tavern, I believe, about three years ago. Q Do you feel that you could sit here and fairly and impartially listen to the evidence and—A No, I don't think I could.

"MR. DOWNS: I would like to make it abundantly clear that there was no such incident with Mr. Pflugradt at all. MR. PARKER: Well, I don't know. MR. DOWNS: No. We would like to approach the bench. THE COURT: Come up, please.

"(The following proceedings were had outside the hearing of the jury panel):

"MR. DOWNS: We are right back where we started. We now have a situation where this juror says he has seen Mr. Pflugradt—THE COURT: No; he said a man. He said he thinks he knows Mr. Pflugradt. MR. DOWNS: In a similar incident, which would mean with a firearm, in the Swan Tavern. THE COURT: Well, all right. MR. DOWNS: And that is absolutely untrue; no such incident, directly or indirectly, or anything which could remotely—THE COURT: All right, make your motion. MR. DOWNS: I make a motion for a mistrial. THE COURT: Well, we will take it up. Step aside.

"(The proceedings returned to open court):

"THE COURT: Mr. Parker, Mr. Pflugradt and Mr. Downs want to assure us this is not true, that you made a mistake in identity. This could be very damaging to say that he had done something like this once before and hadn't been convicted. Are you satisfied in your own mind 100% that the guy you say—MR. PARKER: No, I'm not. Like I say, I didn't see the people very well. THE COURT: Well, they say that it's not true. Are you willing to accept that? MR. PARKER: Yes, sir, I am. THE COURT: Do you think it will bother you at all, after having been assured by the Court that who you saw was not this man, or if you think it might bother you the slightest bit, we will excuse you? MR. PARKER: I do feel it might bother me. THE COURT:

I can see where it would. You will be excused. Were you here last week? MR. PARKER: Yes, sir. THE COURT: All right. You can be finally excused, then, now. (Mr. Daniel Parker excused.) THE COURT: Now, Mr. Parker has stated to us in the presence of everyone that he is not sure this is the man he saw, but he feels it would still bother him, and I can see where it would. Let me ask this: If Mr. Parker was mistaken, and he probably was, he doesn't know for sure, but evidently he saw some incident similar, although he doesn't know because he hasn't heard any evidence—I haven't either, so I don't know what happened either, but is there anybody here on this panel that thinks this would bother them, that it would affect your judgment one way or the other? (No response.) If you do, would you please raise your hand, if anybody thinks it would bother them or affect their judgment? (No response.) All right. Thank you very much. You may proceed, Mr. Insco.

"(The following proceedings were had outside the hearing of the jury):

"MR. DOWNS: Your Honor, I think the interrogation by the Court emphasized rather than diminished the damage which has been irretrievably done to this jury panel, and we again ask that there be a mistrial and to draw a new panel. THE COURT: Motion denied. Let's proceed."

Appellant argues that the foregoing tainted defendant's presumed innocence before the trial began, and "must have had the effect of suggesting to the venire that [he] was inclined to commit the crime with which he was charged." He argues also that Parker's statements "were tantamount to testimony by a de facto witness who was neither sworn upon his oath nor subjected to cross-examination." This, he asserts, was a denial of his Sixth Amendment guarantee of the right of an accused to confrontation of witnesses. He asserts also that Parker's statements were emphasized in the State's closing argument. However, defendant made no objection to the referenced argument, and the point is not for

review on that account, *State v. Spencer*, 486 S.W.2d 433 (Mo.1972); *State v. Larkins*, 518 S.W.2d 131 (Mo.App.1974).

■ Grant of a mistrial is a drastic remedy, *State v. Johnson*, 504 S.W.2d 23 (Mo.1973), *State v. Camper*, 391 S.W.2d 926 (Mo.1965); is granted only in those circumstances where the alleged prejudice can be removed in no other way, *State v. Goff*, 490 S.W.2d 88 (Mo.1973), *State v. Pruitt*, 479 S.W.2d 785 (Mo. Banc 1972); and grant or refusal of a mistrial lies within the discretion of the trial court, *State v. Phelps*, 478 S.W.2d 304 (Mo.1972). The trial court is accorded discretion in determination of qualifications of veniremen and doubts about their qualifications are resolved in favor of the determination made by the trial court. *State v. Wilson*, 436 S.W.2d 633 (Mo.1969); *State v. Wraggs*, 512 S.W.2d 257 (Mo.App.1974); *State v. Harris*, 425 S.W.2d 148, 155 (Mo.1968). This record shows that the trial court asked all other veniremen if their judgment would be affected by the Parker incident and received no response. Such action was within the discretion accorded the trial court in determination of qualifications of jurors, and has been upheld in similar circumstances. See e. g., *United States v. Carter*, 528 F.2d 844 (8th Cir. 1975); *State v. Hawkins*, 362 Mo. 152, 240 S.W.2d 688 (1951). Cf. *State v. Romprey*, 339 S.W.2d 746 (Mo. Banc 1960).

■ Appellant charges the court erred in refusing to give his instruction "relating to the lesser included offense of common assault." He argues there was evidence to show common assault because it conflicted as to the location of witness Moore at the time the shotgun was discharged and that it may not have been exhibited in a rude, angry, or threatening manner in Moore's presence.

The statement of this case demonstrates that defendant entered Fox's Tavern with a shotgun, used abusive and threatening language to the patrons including Fred Moore, and demanded the return of his wife's keys. After continuing his tirade for several minutes, defendant discharged his gun into the ceiling and left. Such evidence does not show commission of common assault as

defined, § 559.220 RSMo 1969: "Any person who shall assault or beat or wound another, under such circumstances as not to constitute any other offense * * *." It does show that defendant was guilty of the offense charged or of nothing. The case is thus similar to *State v. Morris*, 523 S.W.2d 329 (Mo.App.1975), where defendant displayed an open knife on a crowded bus and threatened some of the passengers. The trial court's refusal to give an instruction on common assault was affirmed: "When the evidence shows, as it does here, guilt of the more serious crime charged, and no other interpretation of defendant's conduct is reasonably possible, and there is nothing to justify a finding of common assault only, defendant is not entitled to an instruction on common assault." 523 S.W.2d l.c. 332.

Judgment affirmed.

All concur.