**STATE of Missouri, Respondent,**

v.

**James Harold HARRIS, Appellant.**

No. 48590.

Supreme Court of Missouri,

Division No. 2.

Nov. 13, 1961.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 11, 1961.

William B. Spaun, Hannibal, for appellant.

Thomas F. Eagleton, Atty. Gen., Ike Skelton, Jr., Special Asst. Atty. Gen., for respondent.

BARRETT, Commissioner.

A jury found James H. Harris guilty of burglary and stealing and fixed his punishment at three years' imprisonment for the burglary and two years for stealing. While he does not question the sufficiency of the evidence to sustain the conviction, the circumstances, as the jury could find them, have a material bearing on his claim that he is entitled to a new trial because of the closing argument of the prosecuting attorney and the giving and refusal of certain instructions.

Miss Louise Clayton keeps furnished and owns a two-story frame residence one mile west of Rensselaer in Ralls County. October 13, 1959, she returned to her farm home after a month's absence to discover that the house had been entered and that several pieces of furniture were missing. Among the missing items were eight dining room chairs, a bedroom chair, two end tables, a clock, a pair of brass candlesticks, two wrought-iron planters and a set of mounted steer horns. All of these furnishings were heirlooms and antiques, the eight dining room chairs were made of "wormy chesnut." Investigation revealed that a downstairs window had been pried and propped open with a stick and it was apparent that "something" had been taken out through the window. About 1:30 in the afternoon Miss Clayton heard a motor vehicle enter the driveway, she looked out and saw a green pickup truck with a light top, and she saw that the two men in the truck were "colored men," the driver much heavier than his companion. She did not get the license number of the truck and subsequently could not identify the two men, "they backed out of the drive and drove very swiftly away."

The principal witness against the appellant was Robert Earl Gardner, also a colored man. He said that while living in Hannibal he and Harris bought and sold junk together. On September 29, 1959, (the alleged date of the burglary and theft) they drove into the country near Rensselaer in Harris' green Chevrolet pickup truck looking for junk. They drove up to the Clayton farm home and "there was a lot of weeds and things," so they "took a look to see if there was any scrap or things laying around." They found a couple of pieces of metal in a pile of tin cans and then they looked in a downstairs window and saw that "everything was covered." According to Gardner they entered the house through the unlocked window. "we raised it together" and propped it open with a stick. Gardner got back outside and Harris "handed me chairs" and other furniture through the window and Gardner placed it in the truck. They drove to Hannibal where Harris listed several of the articles, particularly the chairs, with Bridgman's auction. The next day they attended Bridgman's auction but the bids on the chairs were too low and Harris bid them in. He and Gardner again placed them in Harris' green truck and drove to Dierke's, a dealer in secondhand furniture, but Dierke only took the clock and the mounted horns for which he eventually paid them eight dollars. When they parted that day Gardner took an end table and a footstool to his home, (later he gave these two articles to the sheriff) and when Harris drove away the chairs were on his truck and Gardner never saw them again. Gardner did not remember the date but "maybe two weeks" after their first trip, he and Harris made another trip to the Clayton farm in the green truck. "We started to drive up in the yard and I saw the window was up and so I said somebody is in there, I saw a woman in there so we backed up and left."

In his investigation the sheriff found one of the end tables in the home of Harris' mother, he found the receipt where Harris

had listed the items at auction and he recovered the clock and mounted horns from Dierke but he was unable to find the missing chairs. After Harris was arrested he told the sheriff and a highway patrolman that "he would try to return the chairs if we would let him out of jail." The sheriff would not release him and he denied any knowledge of the "whereabouts" of the chairs and "refused to tell us anything except to lay off of him." Harris was released on bond and in a few days brought six or seven chairs to the sheriff but only the bedroom chair and four of the dining room chairs belonged to Miss Clayton. Harris took the two chairs that did not belong to Miss Clayton and in a day or so returned with two more of her wormed chesnut chairs. But he refused to tell the sheriff where he had been or where he got the chairs.

Testifying in his own behalf Harris said that he had "been in that vicinity" with his green truck, but he denied that he had ever been in Miss Clayton's house or that in October he had driven into her driveway and he emphatically denied that he was with Earl Gardner when the furniture was stolen. His version of how he "got in possession of the furniture" was this: "Well, as Earl said, we were junking. We would go out and get tin and what not, I can't quite recall when it was, but anyway Earl was telling me about a load of furniture a fellow had. Earl come got me and told me about the furniture. I saw the furniture. I bought it because I could get a profit off of it." He said that "this fellow" had the furniture on a truck on Broadway in Hannibal and that he paid him "somewhere in the neighborhoood of $15.-00" (its value was approximately $525.00). He admitted listing the furniture with Bridgman, the sale of the clock and horns to Dierke, that he took an end table to his mother and, he says that Earl "took his two pieces." As to the chairs, he said, "We took them to Quincy which we sold. I made a small profit, somewhere around $30.00 that we sold and split the money."

He says that he sold the chairs to some colored people he met through Earl, "up around 10th Street, a tavern up there." He thought the purchaser of the chairs was a man named "Hudson" or, later, "Hutchison" and the seller was "Elliott." But he was unable to further identify any of these people and did not know where they lived. After his release on bond, however, he "went back to the guy and he had sold them," but he located the chairs, refunded the money he had received and returned six or seven of them to the sheriff because "I told the Sheriff I would try to help him locate these chairs which I did."

In addition to his own testimony, Harris had three witnesses, his pastor and two former employers, who testified to his good reputation for "morality, veracity and good citizenship." In rebuttal the highway patrolman testified that his reputation for "truth, honesty and veracity" was "very bad."

In these background circumstances the meritorious question is whether the appellant is entitled to a new trial because of the closing argument of the prosecuting attorney. The appellant claims that the argument was manifestly inflammatory, that it was unfair and improper and that the prosecuting attorney thereby infringed his right to a fair trial. That part of the argument complained of in the motion for a new trial and with some bearing on the problem presented is this (emphasis supplied):

"Mr. Spaun (appellant's counsel) says that Mr. Harris has made some effort toward rehabilitation because of another crime which he has committed in the past, possession of narcotics in Iowa. Is it a part of his rehabilitation that he comes on the stand here before this jury, *not as a confessed thief, no, but a lying thief,* lying to you about— Has he started any rehabilitation? Certainly he hasn't. *It is up to this jury to determine whether or not Mr. Harris came in here with a concocted*

*lying story.* True, Mr. Gardner came in, he was a party to this theft and to breaking into the house. Now, Mr. Gardner is making some effort toward rehabilitation after the commission of this crime. He came in, and true, he was ashamed. He hung his head, and he said, 'I did break into this house and steal from it.' Mr. Harris came in and said 'No, I didn't steal from the house, I didn't break into the house,' *and then made up his story that he tries to get you to believe. Whether he is lying or not, is up to you.* Certainly, it does not appear there is any rehabilitation to what interpretation I was able to place on it."

■ The objectionable language, obviously, is the denunciatory epithet, "a lying thief," which out of context would appear to be the prosecutor's personal opinion, not an inference or conclusion drawn from the evidence. A prosecuting attorney should not apply denunciatory personal epithets to either the defendant or his witnesses (State v. Taylor, 320 Mo. 417, 434–435, 8 S.W.2d 29, 37) and the language and manner of expression here was unnecessary (see State v. Smith, (Mo.) 242 S.W. 83), even intemperate, but the argument is not comparable to the unbridled outbursts in State v. Teidt, 357 Mo. 115, 206 S.W.2d 524. Another factor is that the trial court has some discretion in controlling argument as well as in determining whether it improperly influenced the verdict. State v. Roseberry, (Mo.App.) 283 S.W.2d 652, 658. The court overruled appellant's objection to the argument and there were no corrective measures (compare State v. Johnson, 351 Mo. 785, 174 S.W.2d 139) and there is no indication of the court's opinion as to the effect of the argument except as it may be inferred from the overruling of the motion for a new trial. On the other hand, the appellant was a witness, he had character witnesses and within limits the prosecuting attorney had a right to comment on his character (annotation 70 A.L.R.2d 559) and he also had a right to comment on the truth or falsity of the testimony from the state's viewpoint. State v. Poucher, (Mo.App.) 303 S.W.2d 197, 199; State v. Woods, 346 Mo. 538, 547, 142 S.W.2d 87, 89. Out of context the term "lying thief" might be construed as an expression of the prosecutor's personal belief or as an assertion of his knowledge of the appellant's guilt (annotation 50 A.L.R.2d 766), but in context and ultimate effect it may be no more than counsel's conclusion as to the reliability of appellant's testimony and therefore not intended as "positive evidence" as is sometimes the fact when counsel attributes perjury to witnesses. Annotation 127 A.L.R. 1385, 1415. In general, "whether particular remarks * * * of counsel, with reference to perjury, constitute reversible error must depend upon the attending circumstances, including their degree of temperateness, (and) their justification, in view of the evidence." 127 A.L.R., l. c. 1415. After making the positive statement counsel immediately said that it was up to the jury to determine whether the appellant "came in here with a concocted lying story" and finally he told the jury that "Whether he is lying or not, is up to you." From the state's standpoint there was some justification for the statement, and, weighing all the indicated factors, in the detailed circumstances and context of the trial, it may not be said that the appellant is entitled to a new trial. State v. Jackson, 336 Mo. 1069, 1081–1082, 83 S.W.2d 87, 94–95, 103 A.L.R. 339; 127 A.L.R., l. c. 1423.

■ The appellant did not mention instruction 11 (relating to the testimony of an accomplice) in his motion for a new trial (State v. Lord, (Mo.) 286 S.W.2d 737, 742) and his assignment in the motion that the court erred in refusing instruction A (also relating to the testimony of an accomplice) "because it fairly and fully declared the law in said cause" is quite indefinite and does not state a ground or cause for a new trial (Sup.Ct.Rule 27.20, V.A.M.R.; State v. Johnson, (Mo.) 293 S.W.2d 907), hence the

giving and refusal of these two instructions is not subject to review.

 Instruction 1 is a short, introductory statement that all persons are equally guilty who "act together with a common intent in the commission of a crime, and a crime committed by two or more persons acting jointly, is the act of all and of each one so acting." State v. Dowell, 331 Mo. 1060, 1064, 55 S.W.2d 975, 976. Instruction 5 followed the principal instructions and informed the jury that the information was merely the formal charge, that the defendant was presumed to be innocent; it charged the jury upon the subject of reasonable doubt, the credibility of witnesses and told the jury that if they believed that any witness had sworn falsely they might reject all or any part of the testimony of such witness. The appellant now contends, as he did in his motion for a new trial, that these instructions place an undue burden on him and are confusing and misleading in that they are abstract and contain no direction as to how the jury should apply them. The instructions are abstract but they are conventional, cautionary instructions and the appellant does not point out in what manner or how they place an "undue burden" upon him (State v. Drake, (Mo.) 298 S.W.2d 374), in fact they caution the jury and are thus favorable to him. It is not pointed out just what specific direction could have been added for the jury's information, even though abstract their application to the evidence and to the other instructions is comparatively simple and plain and it is not apparent how they could mislead or confuse the jury. State v. Reece, (Mo.) 324 S.W.2d 656, 661; State v. Hutsel, 357 Mo. 386, 393, 208 S.W.2d 227, 231. The instructions were all connected, a series, and impliedly if not specifically the direction of the court was to consider these particular instructions in connection with the other and principal instructions and apply them to the evidence and the trial in general and upon this record they were not reversibly erroneous for the reasons assigned here.

 Questions not required to be presented and preserved in a motion for a new trial have been examined and the transcript shows compliance with respect to all matters necessary to be considered by this court "upon the record before it." Sup.Ct.Rule 28.02. The information appropriately charges the appellant with the offenses of burglary and stealing (V.A.M.S. §§ 560.045, 560.110, 560.156), the verdict is in proper form and responsive to the information, there was allocution and the sentence and judgment are responsive to the verdict. State v. Mallory, (Mo.) 336 S.W.2d 383, 387. Since there is no error upon the transcript the judgment is affirmed.

All concur.

BOHLING and STOCKARD, CC.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.