**STATE of Missouri, Plaintiff-Respondent,**

v.

**James Lee GRANBERRY,**
**Defendant-Appellant.**

No. 36183.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Oct. 28, 1975.

Motion for Rehearing or Transfer
Denied Dec. 10, 1975.

Application to Transfer Denied
Jan. 12, 1976.

Slonim & Ross, Arthur H. Slonim, Clayton, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Lucia Leggette, Jefferson City, Gene McNary, Pros. Atty., George Westfall, Asst. Pros. Atty., Clayton, for plaintiff-respondent.

GUNN, Judge.

Defendant-appellant James Granberry appeals from his second conviction for the first degree murder of University City police officer Wilber Downey. In 1971, defendant was convicted of the murder of Officer Downey and his punishment assessed at death, but on appeal to the Missouri Supreme Court the judgment of conviction was reversed and the cause remanded for a new trial.[1] On the second trial, defendant was again convicted of the first degree murder of Officer Downey and sentenced to life imprisonment. On this appeal of his second conviction, defendant raises six points of alleged error. He contends: 1) that the trial court was without jurisdiction to try his case as the trial was held on a suspended indictment; 2) that the trial court erroneously admitted evidence of other crimes for which defendant was not on trial; 3) that the trial court erred in overruling defendant's motion to suppress certain evidence alleged to be the product of an illegal arrest; 4) that various comments and arguments of the prosecuting attorney regarding defendant were so vituperate and vitriolic as to deprive him of a fair trial; 5) that defendant was materially prejudiced by the admission of alleged inadmissible testimony by a police officer investigating the case; 6) that fingerprint evidence was admitted without proper foundation. We find no reversible error and affirm the judgment.

The facts are these. During the early morning of December 12, 1969—around 1:30 a. m.—a brown Pontiac carrying five young men entered a Clark service station on Olive Street Road in University City. After being served by the station attendant two of the men from the car ordered the attendant into the back room of the station and forced him to lie down on the floor. The two men took the attendant's money from his pockets and pried open a cabinet. While the robbery was in progress, several customers drove into the station for service, and some of the customers noticing suspicious activity placed a call for police. University City police, including Officer Downey, responded to the call. Officer Downey entered the station and shots were heard. The station area was raked with an enfilade of gun fire, and the customers at the station scurried to lie doggo for safety. Two men, later identified as defendant and his cousin Darryl Granberry, were observed firing pistols and fleeing from the back room of the station. The identification of defendant was made by University City Police

1. *State v. Granberry*, 491 S.W.2d 528 (banc 1973).

Officer Edward Steinmeyer who had responded to the call and who was involved in an exchange of gun fire with the Granberrys.

Subsequent to defendant's first trial and prior to his second trial, Officer Steinmeyer died of natural causes, and his testimony from the first trial was read to the jury. Officer Steinmeyer testified that he fired his revolver until empty at the fleeing defendant and Darryl Granberry, wounding Darryl and halting his flight; that defendant with a revolver in his hand ran to the Pontiac pursued by Officer Steinmeyer. Defendant was able to enter the Pontiac, and Officer Steinmeyer reached through the open car window and struck defendant on the top of the head three or four times with his empty revolver in an effort to subdue defendant. However, defendant was able to escape in the Pontiac. Officer Steinmeyer testified that he had a good look at defendant's face and positively identified defendant as the person he had observed running from the station with a gun in his hand and who he had struck on the head and who had escaped in the Pontiac.

The pistol which Officer Steinmeyer observed defendant carrying as he was fleeing from the station back room was found on the Clark station lot at the point where the Pontiac had been parked before defendant's escape. The pistol which Officer Steinmeyer had seen defendant carrying and which was found on the ground after defendant had escaped was identified as belonging to Officer Downey. Ballistics established that Officer Downey had been fatally shot in the back by his own pistol.

Four of the participants in the incursion into the Clark station were arrested at the scene on December 12. Defendant was arrested in the afternoon of December 12 by St. Louis police. Police examination of defendant's scalp shortly after his arrest revealed a running wound and bump. The brown Pontiac was found abandoned within a mile of the Clark station. A thumbprint lifted from the Pontiac on December 12 after the robbery was identified as defend-

ant's; a black leather jacket with a check stub made out to "T. A. Reinert" in a pocket was found near the abandoned Pontiac. Defendant's defense was that he was elsewhere at the time of the robbery.

## I

Defendant first argues that his conviction and sentence are void on the ground that the indictment upon which he was tried had been suspended by operation of § 545.110 RSMo 1969 and Rule 24.14. Section 545.110 provides:

> "If there be at any time pending against the same defendant two indictments for the same offense, or two indictments for the same matter, although charged as different offenses, the indictment first found shall be deemed to be suspended by such second indictment, and shall be quashed."

On July 9, 1970, an indictment (herein after the first indictment) was filed charging defendant with the first degree murder of Officer Downey. As previously mentioned, judgment of conviction on the first indictment was reversed and remanded by the Missouri Supreme Court. After the cause was remanded, the prosecuting attorney sought and obtained a second indictment, filed on October 12, 1973, containing two counts. The first count charged the defendant with the same crime charged in the first indictment—the first degree murder of Officer Downey. The second count added the charge of first degree robbery.

Prior to trial and with substantial persuasion by the judge of the criminal assignment division and entreatment of defendant's counsel, an agreement was made in open court by the prosecutor and defendant's counsel to try the case under the first indictment with the prosecutor agreeing to the nolle prosequi of the second indictment in its entirety. The trial then proceeded—pursuant to the agreement—under the first indictment, and a formal nolle prosequi of the second indictment was filed four days after the conclusion of the trial. The de-

fendant now argues that the second indictment was in effect throughout the trial and that the first indictment upon which he was tried and convicted at the second trial had no force or validity under § 545.110. Defendant thus suggests that the chasm of imperfection of trial under a suspended indictment is too wide and deep for the State to leap. If the defendant's contention is correct, the circuit court would not have had jurisdiction to try the case, since "there can be no trial, conviction or punishment for a crime without a formal and sufficient accusation. . . . [T]he complete absence of a formal charge is jurisdictional." *State v. Harrison,* 276 S.W.2d 222, 224, (Mo. 1955), *cert. denied, Harrison v. State,* 353 U.S. 942, 77 S.Ct. 822, 1 L.Ed.2d 763 (1957). See also *Montgomery v. State,* 454 S.W.2d 571 (Mo.1970); *State v. Hasler,* 449 S.W.2d 881 (Mo.App.1969); 21 Am.Jur.2d Criminal Law § 390 (1965). It also should be noted that there can be no waiver of formal and sufficient accusation. *Montgomery v. State,* supra; *State v. Gladies,* 456 S.W.2d 23 (Mo.1970); 21 Am.Jur.2d Criminal Law § 390 (1965): "A criminal prosecution necessarily implies the existence of an accusation charging the commission of a criminal offense, as the basis thereof. . . . Such an accusation, in some form, is an essential requisite of jurisdiction which cannot be waived."

▮▮▮ Section 545.110 has been construed to be self-executing. *State v. Brown,* 364 Mo. 759, 267 S.W.2d 682 (1954). Thus, if there are two indictments filed for the same offense, the first is automatically suspended. *State v. Payne,* 223 Mo. 112, 122

S.W. 1062 (1909); *State v. Vincent,* 91 Mo. 662, 4 S.W. 430 (1887). And while the second indictment is in effect, the first indictment is considered as having no force or vitality. *State v. Mayer,* 209 Mo. 391, 107 S.W. 1085 (1908); *State v. Williams,* 191 Mo. 205, 90 S.W. 448 (1905); *State v. Melvin,* 166 Mo. 565, 66 S.W. 534 (1902). However, the validity of an earlier indictment can be revitalized and can be used to prosecute the defendant if the later indictment is no longer pending against him. In *State v. Melvin,* supra, where the second indictment was quashed prior to the trial on the first indictment, the court stated that:

> "The first [indictment] is merely suspended *but new life and validity may be imparted to it by the removal of the obstacle which caused the suspension,* to wit, the second indictment, as was done in this case, by quashing it on the record. . . . [T]he statute requires the first indictment to remain suspended pending the period the second is in force, unless actually quashed by the court on the record; but, if the second is itself quashed without the first having been quashed, the first is restored to all its vigor. . . ." *State v. Melvin,* supra at 535–536. (Emphasis added.)

The question for us to determine is whether the "obstacle" of the second indictment had been removed prior to the defendant's trial thus making trial on the first indictment correct.[2]

The defendant contends that the second indictment was pending throughout the trial as evidenced by the filing of the nolle

---

2. New York has had a superseding indictment statute virtually identical to Missouri's with the exception that the New York statute has used the term "superseded" rather than Missouri's "suspended." N.Y.Code Cr. Proc. § 292–a, 1909 (now N.Y.Crim. Proc.Law § 200.80) provided:

> "If there be at any time pending against the same defendant two indictments for the same offence or two indictments for the same matter although charged as different offences, the indictment first found,

shall be deemed to be superseded by such second indictment, and shall be quashed." Despite the fact that the Missouri Supreme Court has noted that the New York statute is "stronger" than Missouri's, *State v. Melvin,* supra, the New York courts have given their statute a less severe interpretation. The statute is not viewed as self-executing. *People v. Sloan,* 175 Misc. 618, 24 N.Y.S.2d 381 (1940), and both indictments retain their vitality until the first is set aside by a court order. *People v. Barry,* 4 Parker Cr.R. 657,

prosequi after the conclusion of the trial. If this contention is correct, then *State v. Mayer*, supra, is controlling and a reversal of the conviction would be required. In *State v. Mayer*, supra, two informations charging the same offense were pending against the defendant. Trial was had on the first despite the fact that the second remained pending throughout the trial. The Missouri Supreme Court found that trial on the first indictment was improper

and reversed the conviction.[3] In the case before us there is no dispute concerning when the nolle prosequi of the second indictment was filed. However, we find that there was an agreement entered into by all the parties prior to the commencement of the trial which was sufficient to dispose of the second indictment and thereby revive the first. The evidence of such an agreement, binding upon both parties is palpable.[4]

(N.Y.1860). Trial can be had on either indictment, and the defendant is free to waive the effect of the statute. *People v. Benson*, 208 Misc. 138, 143 N.Y.S.2d 563 (1955); *People v. Sloan*, supra; *People v. Barry*, supra. In *Benson* it was stated that "if the People elect without objection from the defendant to go to trial on the *first* indictment, the resulting verdict will not be disturbed. . . . And, while the superseding indictment is pending, a defendant may plead guilty to the *first* indictment. His plea of guilty constitutes a waiver of the provisions of section 292–a C.C.P. in his favor." 143 N.Y.S.2d at 574. In New York, if the instant situation existed, the indictment issue would probably be resolved by the old case of *People v. Barry*, supra, which is directly in point. In that case two indictments were filed, the first for a less hazardous offense than charged in the second. The defendant pled guilty to the first indictment and later moved that the conviction be quashed due to the superseding second indictment. The appellate court rejected this contention:

"From the case as it now appears, it is a legitimate conclusion that this defendant preferred a conviction by confession, on the indictment for the minor offense, in its mitigated form, to the hazard of a conviction by the jury, on the trial of the indictment for the greater offense, and acted accordingly. In my opinion, it was competent for him to waive the provision of the statute in his favor, and I think he was clearly and advisedly done so; and that after his confession, he had no right to claim the benefit of the statute which he so waived." 4 Parker C.R. 657, 661 (1860).

**3.** The court also found the first information to be internally defective in that it failed to allege one element of the crime charged. However, the court clearly reversed the conviction on both grounds.

**4.** The following excerpts from the transcript given under oath by the court and counsel, clearly establish the fact of a binding agreement upon the parties to try the case on the

first indictment and of the elimination of the pendency of the second indictment, thereby properly reviving the first indictment:

"MR. WESTFALL (prosecutor): . . . [T]he State, through myself, and defendant, through Mr. Anzalone, [defendant's counsel] agreed on a continuance to a future date based on a specific commitment from the State that the State would proceed under the first indictment; that it was only one charge, Murder in the First Degree, and the State would not proceed on the second indictment, which was Count I Murder in the First Degree and Count II Robbery by means of a Dangerous and Deadly Weapon. The State made that commitment and with that commitment in mind, Mr. Anzalone agreed to the continuance. And that was the condition that he requested in order to agree to the continuance.

THE COURT: The State and Mr. Anzalone would stipulate on his agreement, or insistence, or whatever, it be tried on the single count; that that was the basis for the continuance?

MR. WESTFALL: That is my understanding, Judge. Do you agree with that, Mr. Anzalone?

MR. ANZALONE (Defendant's counsel): *I agree with that completely.* My position was, in fact, was that the State should be enforced to elect one of the two indictments. And my position was, it was to my client's interest to go ahead with the one count indictment. *And my interpretation of the agreement with Mr. Westfall was we would agree to proceed on the first indictment and he would nol-pros the second one.*

THE COURT: You felt it was to your client's interest to go to trial on the old indictment, the single count indictment and you understood and relied on the prosecutor's statement that he would nol-pros the second indictment?

MR. ANZALONE: I felt it was to my client's interest to go to trial on the one charge, rather than two. The age of the

Counsel for the defendant readily admitted that he had strenuously urged the prosecutor not to seek the second, two count indictment. After the second indictment was obtained, defense counsel continually requested that the prosecutor go to trial on the first indictment. Judge Schaaf, the criminal assignment judge, also attempted to dissuade the State from going to trial on the second indictment. Both Judge Schaaf and counsel for the defendant strongly expressed that it would be unfair to add a new charge four years after the crime. Defense counsel also argued that there would be problems with obtaining testimony on the new count, since one of the officers involved had died after the first trial. Defendant's counsel stressed that the addition of the new count would in effect punish the defendant for winning his appeal of his first conviction. Judge Schaaf testified on the motion for new trial that he was responsible for convincing the prosecuting attorney to try the case on the first indictment. Although reluctant at first, the prosecuting attorney finally did agree to go to trial on the first indictment with the consideration that defendant would agree to a continuance of the case to a later setting. He also agreed to a nolle prosequi of the second indictment. The record is conclusive that a binding agreement was made to try the case on the first indictment thereby voiding and terminating the

indictment didn't matter. For the record, I think I should also indicate, and Mr. Westfall will agree, prior to getting the indictment, the day before, I tried strenuously to persuade him from doing it and talk him out of it, and expressed to him the same grounds why he should not do it—as in the chambers—why he should not.

THE COURT: Namely, what were your argument? [sic]

MR. ANZALONE: Probably with the use of the testimony of a dead officer; the problem of penalizing someone for winning his appeal; probably waiting until the last minute to seek it and thereby prejudicing defendant's rights to due process.

MR. WESTFALL: I would agree that prior to seeking the two count indictment Mr. Anzalone tried to persuade me from doing that, but I went ahead and sought the second indictment. The Grand Jury indicted Mr. Granberry in two counts. Mr. Anzalone from that point encouraged me or attempted to persuade me to pursue the first indictment consisting of only one count and I agreed with him in his summation, which occurred at the time of one continuance. In effect, or actually, the State did commit itself to nol-pros the second indictment and Mr. Anzalone knew when the case went to trial it would be going on the old indictment. I will ask Mr. Anzalone if he will agree from that time, or at any time onward from the time trial commenced until its termination whether he was under any doubt under which indictment his client was being tried?

MR. ANZALONE: That's true.

MR. WESTFALL: And you, at all time, knew he was being tried under the first indictment?

MR. ANZALONE: That's true.

MR. WESTFALL: And your desire was that he be tried under the first indictment?

MR. ANZALONE: I felt it was in my client's best interest.

＊　　＊　　＊　　＊　　＊　　＊

Q (Mr. Westfall) All right. Concerning which of the two indictments Mr. Granberry was to be put to trial on, do you recall any conversation between the State and the Defendant?

A (Judge Schaaf, criminal assignment judge) Yes.

Q What were those conversations?

A The conversation was an agreement, as I understood it to be, was that he would go to trial on the old one, that indictment, the one I tried him on some three, four or five years before that.

Q Was it your understanding it was the defendant's desire to go to trial under that one, rather than the new one?

A Yes, it was.

Q Was it your understanding the State, in fact, agreed to go to trial under the old indictment?

A You did agree to do it because I told you I thought it would not be fair, after this length of time, it wouldn't be fair to send Mr. Granberry out on the new indictment where he was now charged with armed robbery, and Mr. Anzalone and the Public Defender, and you, and someone else in the Prosecuting Attorney's office, I know but the name slips my mind, discussed the case and it was vehemently discussed. And I finally took the position of Mr. Shaw [public defender] and Mr. Anzalone that it would be unfair, at this late trying of the case, to send out the new indictment, the new case and that we would try the old case.

Q Did the State agree?

A The State agreed." (Emphasis added.)

second; that all were fully aware that the defendant was going to be tried on the first indictment. In ruling on this point, after the hearing on the defendant's motion for a new trial, the trial court made the following findings of fact:

"1. Defendant sought and secured trial on the less hazardous (to him) charge.

2. And obtained an agreement in the presence of the Court that that State would nol-pros the later two count indictment."

We find that the open court agreement was sufficient in itself to dispose of the second indictment and thereby revive the vitality of the first indictment. It is manifest from the record that an agreement to dismiss the second indictment had been made in open court under court supervision. The agreement was binding on both parties. The State by the agreement was, before trial, precluded from trying a case under the second indictment whether or not the ritual of a formal nolle prosequi had been performed. The impediment to trying the first case had been removed by the agreement of the parties, and the first indictment was the proper—and only—indictment upon which the State could proceed against the defendant. The first indictment was not dead, merely suspended, and its vestiges were fully resurrected and restored to life by the agreement which had the effect of putting the second indictment to death. The agreement of the parties was an accomplished fact and binding at the time it was made in open court upon both State and defendant's counsel. *Pierson v. Allen,* 409 S.W.2d 127 (Mo.1966); *Fair Mercantile Co. v. Union-May-Stern Co.,* 359 Mo. 385, 221 S.W.2d 751 (1949); *Landers v. Smith,* 379 S.W.2d 884 (Mo.App.1964). We hold that in light of the agreement made by the parties, with the knowledge and approval of the court, the filing of memorandum of nolle prosequi was not necessary. We view the formal nolle prosequi of the second indictment after the trial was completed as merely ministerial and having no bearing on the validity of the first indictment. Since we find that the second indictment was sufficiently disposed of by virtue of the agreement, this case falls squarely within the holding of *State v. Melvin,* supra. The defendant was properly tried on a valid indictment.

II

The defendant claims that he was denied a fair trial by the testimony of a witness concerning the commission of another crime for which the defendant was not charged nor standing trial. The witness, Terry Reinert, testified that between midnight and one o'clock on the morning of December 12, 1969, he drove to a Phillips 66 service station near Lindbergh and Interstate 70. Upon entering the station lot, he saw a car parked in front of the station's office and saw five males, one by the car and the other four inside the building. He stated that he got a good look at three of the men and positively identified them in subsequent lineups and photographs. One of the three men so identified was the defendant. Reinert also made an in-court identification of the defendant. The other two men he identified were arrested by University City police officers during the course of the robbery at the Clark station. Reinert identified a jacket which he had worn when he had entered the Phillips station and a check stub made out to him. The jacket and check stub were found by police near the abandoned Pontiac. Reinert also identified the automobile, shotgun and metal box which he had seen at the Phillips station and which were recovered in the aftermath of the Clark station robbery.

■ Defendant asserts that it could be inferred from Reinert's testimony that defendant was involved in a robbery of the Phillips station, a crime for which he was not charged, and that, therefore, the testimony should not have been admitted.

"[P]roof of the commission of separate and distinct crimes generally is not admissible unless proof thereof has a legiti-

mate tendency to establish the defendant's guilt of the particular charge for which he is on trial. If improperly related to the cause on trial, testimony of other crimes for which defendant may be guilty violates his right to be fairly tried on the offense for which he is charged." *State v. McElroy,* 518 S.W.2d 459, 460–461 (Mo.App.1975). See also *State v. Lee,* 486 S.W.2d 412 (Mo.1972).

But evidence concerning separate and distinct crimes can be admissible when it tends to prove or establish: 1) motive; 2) intent; 3) absence of mistake or accident; 4) common scheme embracing commission of two or more crimes related to each other—the proof of one tending to establish the other; and 5) the identity of the accused. *State v. Reese,* 364 Mo. 1221, 274 S.W.2d 304 (banc 1954); *State v. Gay,* 523 S.W.2d 138 (Mo.App.1975); *State v. Morris,* 523 S.W.2d 329 (Mo.App.1975).

■ The State contends that the testimony was necessary in placing Granberry at the Clark station and in refuting his alibi. It should be noted that the defendant was the only one of the five participants not arrested at the scene of the crime. The State also points to the fact that there was only one eye witness that could identify James Granberry as the man escaping from the Clark station—Officer Steinmeyer; since Officer Steinmeyer had died between the defendant's first and second trial, the State was required to read into the record the police officer's identification made at the first trial. It was the State's position that Officer Steinmeyer's testimony should be corroborated. Thus, through Reinert's testimony, the State attempted to prove that approximately one hour prior to the Clark station incident, the defendant was with four other men at the Phillips 66 service station. By tying Reinert's testimony in with other facts in evidence, the State sought to establish that the five men Reinert saw at the Phillips station were in fact the same men involved in the robbery of the Clark station and the murder of Officer

Downey. Reinert identified two men other than the defendant as being at the Phillips station. The car that Reinert saw at the Phillips station and later identified by Reinert at the University City police lot was shown to be the car used by the five men at the Clark station as well as the car used by the defendant in his escape.

The shotgun found by the police at the Clark station was identified by Reinert as being similar to the one he saw at the Phillips station. Darryl Granberry's (defendant's cousin) fingerprint was lifted off the white cash box found at the Phillips station and identified by Reinert. From Reinert's testimony, it is logically inferable that the group at the Phillips station was the same group that robbed the Clark station and murdered Officer Downey one hour later. Since the defendant was identified as being a part of the group at the Phillips station, Reinert's testimony tends to prove that the defendant was present at the Clark station. Thus, we find that Reinert's testimony concerning what he saw at the Phillips station was properly admitted under the "identity" exception despite the fact that it tended to show the commission of another crime for which the defendant was not standing trial. But we also note that there was absolutely no reference by Reinert or any witness to any robbery occurring at the Phillips 66 station, although it would be somewhat fatuous to suggest that a jury could not infer that some type of crime had taken place at the Phillips station.

■ Our inquiry does not stop here. We must examine the testimony to determine whether or not it went beyond what was legitimately necessary to prove a material fact in issue. Since there exists a strong possibility of prejudice from such testimony, it has been held that reference to details of the uncharged crime, not logically relevant to the issue in question, is impermissible. *State v. Lunsford,* 338 S.W.2d 868 (Mo.1960); *State v. Griffin,* 336 S.W.2d 364 (Mo.1960); *State v. Reese,* supra. We find that Reinert's testimony was properly ad-

missible. The witness never expressly stated that he witnessed a robbery at the Phillips 66 station. Although it could be inferred from his testimony that the five men were in the process of robbing the station, this in itself does not make his testimony inadmissible. "[T]he fact that this testimony tended to show commission of other crimes (not gone into in detail) did not make it inadmissible." *State v. Lunsford,* supra, at 872. With the exception of one instance, Reinert's testimony did not go beyond relating details necessary to refute the defendant's alibi and establish his presence at the Clark station. The one instance mentioned occurred when Reinert was testifying about the shotgun one of the men was holding. In response to the question asked by the prosecutor: "Where did you see that (the shotgun)?", the witness answered: "Pointed at me." This response related a fact not relevant to refuting the defendant's alibi or placing him at the scene of the murder. However, it appears from the record that the witness volunteered this answer and that it was not really responsive to the question asked. The defense counsel's motion for mistrial was denied. The court did, however, instruct the jury that "with reference to this witness' testimony, his comment that in regard to the shotgun whether it was pointed at anyone or not is irrelevant to this proceeding and that comment of the witness may be stricken and you may disregard." Under these circumstances, the language in *State v. Parker,* 476 S.W.2d 513, 516 (Mo.1972) is particularly appropriate:

> "The remarks objected to were volunteered by the witnesses. Errors of this nature cannot always be avoided, but when they do occur it is the duty of the trial court, who has observed the incident

and is in a better position than an appellate court to evaluate the prejudicial effect, if any, to determine the possibility of its removal by action short of a mistrial. In this respect the trial court necessarily must be vested with broad discretion."

We hold that the trial court did not abuse its discretion in denying the drastic remedy of a mistrial. For the reasons stated above we find that Reinert's testimony was properly admitted [5] and particularly relevant to placing defendant in the car used in the robbery. *State v. Gay,* supra.

### III

■ The defendant asserts that the trial court erred in overruling part of his motion to suppress evidence obtained as a result of an allegedly illegal arrest. He contends that the arrest was illegal because it was made without probable cause. The defendant was arrested in the city of St. Louis at 3:30 p.m. on December 12, 1969, the day of the robbery. The arrest was made without warrant by Officer Franklin of the St. Louis city police. Prior to going on duty, Officer Franklin was informed at a police roll call that James Granberry was wanted by the University City police in connection with a robbery and homicide. While on patrol, Franklin recognized the defendant and arrested him based on the roll call information. Once arrested, the defendant was searched and some money was found on his person. At 4:00 p.m. on the same afternoon, Officer Steinmeyer, who had grappled with the defendant at the Clark station, was shown and identified the defendant's picture. After this identification was made, the University City police

---

**5.** Our conclusions regarding the admissibility of Reinert's testimony comport with the recent decisions of the U.S. Court of Appeals, 8th Circuit, in *U. S. v. Calvert,* 523 F.2d 895 (8th Cir. 1975) and *U. S. v. Conley,* 523 F.2d 650 (8th Cir. 1975). In *U. S. v. Conley,* supra, the court pointed out that the government was entitled to anticipate the defendant's obvious defense (here, the alibi),

and since the government was faced with a difficult means of proof (in this case the fact that the key identification witness, Officer Steinmeyer, had died), the government was permitted to present evidence of other crimes. In *U. S. v. Calvert,* supra, it was held that probative evidence of other crimes outweighed any prejudicial effect to defendant; so, too, here.

learned that Granberry was being held by the St. Louis police, and two officers were sent to the city to interview him. By parting defendant's hair, the officers found a scalp wound. The defendant's fingerprints were taken and later blood samples obtained. In his motion to suppress, the defendant moved to exclude the money, fingerprints and blood samples, as well as any testimony concerning the discovery of the scalp wound, as fruits of an illegal arrest. The court sustained the motion as to the money and overruled it as to the other evidence. We find that Officer Franklin's arrest, based on the roll call information, was made with sufficient probable cause.

In the hearing on the motion to suppress Officer Twillman of the University City police testified that while at the Clark station, Darryl Granberry, defendant's cousin who had been wounded, identified defendant as the person who had fled from the station. Officer Twillman related that information to other police.

 Based on the identification of defendant by Darryl Granberry, Officer Twillman would have had sufficient probable cause to personally arrest the defendant.

"Information possessed by an officer that a felony has been committed and sufficient identification of the suspect as the perpetrator of the felony constitutes probable cause to believe that the offense was committed by the suspect, justifying arrest without a warrant and reasonable search and seizure as an incident to the arrest (including the taking of fingerprints and the seizure of articles of clothing.)" *State v. Robinson*, 484 S.W.2d 186, 190 (Mo.1972).

Since Officer Twillman had probable cause to make the arrest, other officers who re-ceived the information obtained by Officer Twillman would also have had probable cause to arrest the defendant. *State v. Owens*, 486 S.W.2d 462 (Mo.1972). And inasmuch as arrests made by officers based upon information received over the police radio are valid, *State v. Whorton*, 487 S.W.2d 865 (Mo.1972); *State v. Ward*, 457 S.W.2d 701 (Mo.1970); *State v. Craig*, 406 S.W.2d 618 (Mo.1966); *State v. Morris*, 522 S.W.2d 93 (Mo.App.1975); *State v. Bradley*, 515 S.W.2d 826 (Mo.App.1974), certainly, then, an arrest based on police roll call information forms sufficient basis for arrest without a warrant. Although the information obtained by Officer Twillman was relayed through other persons before reaching Officer Franklin, he possessed probable cause to arrest the defendant. Thus, the arrest was legal and the evidence obtained through the subsequent search was properly admitted. *State v. Hammonds*, 459 S.W.2d 365 (Mo.1970).[6]

In arguing that there was no probable cause for the arrest, the defendant, in essence, is claiming that the testimony of Officer Twillman was not credible. The defendant claims that if Darryl Granberry had in fact made statements implicating defendant they would have certainly appeared in a police report, which they did not. The defendant also notes that the second trial was the first time since the murder in 1969, that there was any testimony concerning Darryl Granberry's statements. These statements were not introduced in the motion to suppress the same evidence held prior to the defendant's first trial in 1971. The defendant also contends that the court's ruling on the motion to suppress demonstrated that the trial judge did not believe Officer Twillman's testimony. The trial court sustained the motion to

---

**6.** In *U. S. v. Stratton*, 453 F.2d 36 (8th Cir. 1972), cert. den. 405 U.S. 1069, 92 S.Ct. 1515, 31 L.Ed.2d 800 (1972), it was said, l.c. 37:

"We think the knowledge of one officer is the knowledge of all and that in the operation of an investigative or police agency the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause. The arresting officer himself need not possess all of the available information." See also *U. S. v. Heisman*, 503 F.2d 1284 (8th Cir. 1974).

suppress the money found on the defendant immediately after his arrest but overruled the motion as to the head wound, blood samples and fingerprints. Since the evidence that was not suppressed was obtained only after Officer Steinmeyer identified Granberry's picture, the defendant argues that the trial court found probable cause to exist only after Steinmeyer's identification and not at the time of Officer Franklin's arrest. The defendant's argument overlooks the trial court's explanation for excluding the money. The court makes it clear that the money was not suppressed because of lack of probable cause:

"As regard to the money it is sustained (the motion to suppress) but on the ground the money is not conclusive on this defendant in this case due to the fact it is pretty clear to all parties concerned that the defendant might have gotten the money from a number of sources, including the other armed robberies he possibly was involved in the same evening."

This sufficiently explains the court's ruling, and it cannot be said that the money was excluded because the trial court did not believe Twillman's testimony.

 The defendant also asserts that the trial court erred in denying his request for formal findings of fact and declarations of law pertaining to the court's ruling on the motion to suppress. In support of his position, defendant relies solely on Rule 26.01, which applies only to court tried cases and does not apply to rulings on pretrial motions. The rule is not apt here.

## IV

 The defendant contends that he was denied a fair and impartial trial due to various statements and arguments made during the trial by the prosecuting attorney. Since the incidents complained of are unrelated to each other, we will deal with each separately.

During the voir dire examination of the jury the prosecutor asked if the fact that the shooting had occurred four years ago would influence their decision. Counsel for the defense moved for a mistrial. Although the court reserved ruling on this motion, no further action was taken and the question was allowed. The defendant also refers us to the prosecutor's closing argument in which reference to the four year interval was made on three occasions. The defendant contends that mention of the four year delay would cause the jury to speculate on the reasons for the delay, including the possibility that the defendant had been a fugitive, or that there had been a previous trial and conviction and successful appeal on the same charge, or that the defendant had stood trial for other crimes during the interval. The defendant cites us to no cases in which reference to delays were found to be a denial of a fair trial. Upon review of the record we find defendant's contention untenable and without merit, for we also note that defendant's counsel was as frequent as the prosecutor in making comment that the crime had been four years previous. In presenting the case for the defense, counsel continually asked alibi witnesses to recall what occurred four years before. We find that references to the four year interval between the shooting and the trial were inevitable and unavoidable. None of the references was designed or intended to improperly inspire speculation on the part of the jurors. We hold that the defendant was not denied a fair trial due to such comments.

 The defendant contends that the prosecutor's numerous references to the fact that the defendant and the other four participants in the murder and robbery were black injected racial prejudice into the trial, especially in light of the fact that the jury was all white. It has been held that "[w]here the color or race of the parties has a factual bearing on the issues, a reference thereto comes within the range of legitimate argument. But appeals to racial prejudice are prejudicial and many times have been held reversible error." *State v. Jack-*

*son,* 336 Mo. 1069, 83 S.W.2d 87, 94 (1935). The record reveals many references to the defendant's race during the prosecutor's opening and closing statements. No objections were made to any of these comments. Although some of the references may have been unnecessary, at no time were such statements derogatory. In addition, the defendant was present throughout the trial, and his identity was at issue. We find the language of *State v. Taggert,* 443 S.W.2d 168, 170 (Mo.1969) to be in point:

> "The record here of the prosecuting attorney's opening statement does not itself show that the reference to appellants as being Negroes was designed to inflame the minds of the jury and thus prejudice appellants. The references are merely descriptive of the persons involved in the crime, and what the state would prove. Furthermore, appellants at no time objected to the term during the prosecutor's opening statement, but awaited the close thereof to move for a mistrial. As the state suggests, if counsel for appellants thought the use of the term really tainted the jury he should have objected when it was first used, rather than counting the number of times it was used, and then registering his objection at the close of the statement."

Further, we do not find the comments prejudicial. We also note that defendant's counsel made numerous references to the fact that blacks had been involved in the crime.

 There was an additional reference to race in the prosecutor's closing arguments when he commented that three of the witnesses who testified were black. " . . . Why would Officer Franklin, a black officer, not that that implies he is any more truthful or not, but if any people think nobody is honest, and this Michael Steele and Thorton are black—." While the prosecutor appears to be ascribing some import to the fact that three black persons testified against the black defendant and therefore added weight should be given to their testimony, however, an objection was made and sustained to the comment and the jury was instructed to disregard it. No further relief was requested, so the defendant received all the relief asked for. He cannot now be heard to complain. *State v. Cissna,* 510 S.W.2d 780 (Mo.App.1974); *State v. Allen,* 429 S.W.2d 697 (Mo.1968).

In a portion of his closing argument, the prosecutor speculated on what the murdered police officer might testify to from his grave. The prosecutor also described the defendant as having a brutal face. The defendant contends that these comments were highly prejudicial in that they inflamed and "personalized" the jury.

 When prosecuting a criminal trial, the prosecutor occupies a quasi-judicial position and has the duty to "vouchsafe the defendant a fair and impartial trial—based upon facts, not guesswork; legitimate inference from the facts, not prejudice; cool analysis and decision, not passion." *State v. Heinrich,* 492 S.W.2d 109, 114 (Mo.App.1973); See also *State v. Tiedt,* 357 Mo. 115, 206 S.W.2d 524 (banc 1947). It is improper for the prosecutor to apply personal epithets to the defendant, *State v. Turnbull,* 403 S.W.2d 570 (Mo.1966); *State v. Harris,* 351 S.W.2d 713 (Mo.1961), and he must avoid argument which would have the effect of inflaming the prejudices or excite the passions of the jury against the defendant. *State v. Tiedt,* supra. However, in reviewing allegedly improper argument, it must be kept in mind that "[t]here exist many unpredictables in the trial of a lawsuit, but perhaps the most unpredictable is the flight to which words may soar in the heat and fatigue of the closing argument. It is thus recognized by our courts that as to the impropriety of argument and its effect, each case must be considered in light of the facts of that particular case." *State v. Wintjen,* 500 S.W.2d 39, 42 (Mo.App. 1973). As was said in *State v. Tiedt,* supra: "We are not concerned with an instance of a single breach arising more or less spontaneously under the stress and excitement of

contest." 357 Mo. 115, 206 S.W.2d 524, 528 (banc 1947).

On its face, the prosecutor's statements seeking to disinter Officer Downey from the grave appear to be inflammatory and outside of the record. However, it is apparent from the record that it was defendant's counsel who made first reference to Officer Steinmeyer's "testifying from the grave," and that Officer Steinmeyer "would say defendant was not guilty." Since the defendant opened up the type of argument, we cannot say that the prosecutor argued improperly by attempting to counteract the effect of the defendant's argument. *State v. Odom,* 353 S.W.2d 708 (Mo.1962).

The prosecutor's description of the defendant as having a brutal face, although unnecessary and intemperate, cannot be said to be so prejudicial or denigratory as to warrant the granting of a new trial. It should be noted that no objection was made to the comment.

The prosecutor's arguments and statements do not approach the flagrantly unbridled argument found to be grounds for reversal in *State v. Heinrich,* supra and *State v. Tiedt,* supra. Although some of the prosecutor's statements may have been somewhat impetuous, this would not automatically require the granting of a mistrial or a reversal on appeal. "Every instance of a prosecutor exceeding the limits of legitimate argument is not a cause for declaring a mistrial." *State v. Raspberry,* 452 S.W.2d 169, 173 (Mo.1970). See also *State v. Wallace,* 504 S.W.2d 67 (Mo.1973); *State v. Harris,* 351 S.W.2d 713 (Mo.1961); *State v. Mangercino,* 325 Mo. 794, 30 S.W.2d 763 (1930). The comments of the prosecutor do not constitute reversible error.

## V

The defendant asserts that he was materially prejudiced by certain aspects of the testimony of University City Police Captain Reich. Captain Reich testified that he and another officer went to the St. Louis police station to interrogate the defendant. In response to a question asked by the prosecutor concerning what the Captain told the defendant prior to the interview, the Captain testified: " . . . I advised him of his rights under Miranda, and I also told him we were investigating the death of one of our officers and that we had information he was involved in that death." At this point counsel moved for a mistrial on the grounds that the statement indicated that the police had evidence of the defendant's guilt other than that presented to the jury during the trial. The trial court sustained the objection. The jury was instructed to disregard the Captain's answer with the exception of that part relating to the giving of the Miranda warnings. The motion for the mistrial was denied. The defendant asserts that the trial court erred in so ruling.

"[A] mistrial should be granted only when the incident is so grievous that the prejudicial effect can be removed no other way. For this reason the declaration of a mistrial necessarily and properly rests largely in the discretion of the trial court who has observed the incident giving rise to the request for a mistrial, and who is in a better position than an appellate court to evaluate the prejudicial effect and possibility of its removal by action short of a mistrial." *State v. Camper,* 391 S.W.2d 926, 928 (Mo.1965). See also *State v. Robinson,* supra; *State v. Flauaus,* 515 S.W.2d 873 (Mo.App.1974); *State v. Heather,* 498 S.W.2d 300 (Mo. App.1973).

In the discussion on this motion between counsel and the court, the court clearly evaluated the statement's effect on the jury as "minimal." We can find no reason for disturbing the trial court's appraisal of the impact of Captain Reich's answer. Any prejudice stemming from the testimony was satisfactorily purged.

During the State's re-direct examination of Captain Reich, the witness was

asked why the interview with the defendant was terminated after a short period of time. Captain Reich answered: "I felt that Mr. Granberry was under the influence of some kind or some type of intoxicant." An objection was made prior to the answer, but the court allowed the witness to respond. The defendant contends that this testimony should not have been admitted because proper foundation had not been laid to support the conclusion reached by the witness. The defendant adverts to two cases that stand for the proposition that "lay witnesses may render an opinion as to the intoxication of another if preceded by evidentiary facts of conduct and appearance personally observed by them to support the opinion." *State v. Fisher,* 504 S.W.2d 281, 283 (Mo. App.1973); See also *State v. Edmonds,* 468 S.W.2d 685 (Mo.App.1971). In both of these cases the defendants were charged with driving while intoxicated. Thus, the testimony as to intoxication in both cases went directly to the crime charged. Such is not the case here. In addition, we find that during his cross-examination of the witness, counsel for the defendant initiated the line of testimony. Counsel brought out the fact that no report was made of the interview. Throughout his line of questioning, defendant's counsel appeared to be inferring that either the police were deficient in their investigation or that they were attempting to cover up something that occurred during the interview. To counteract the effect of the cross-examination, the State asked the question regarding defendant's behavior.

"It is a well settled rule . . . that, where either party introduces part of an act, occurrence, or transaction, . . . the opposing party is entitled to introduce or to inquire into other parts of the whole thereof, in order to explain or rebut adverse inferences which might arise from the fragmentary or incomplete character of the evidence introduced by his adversary, or prove his version with reference

7. Defendant's counsel stipulated that the witness was a fingerprint expert, and the

thereto." *State v. Odom,* supra at 711, quoting from 22A C.J.S. Criminal Law § 660c (1961); See also *State v. Bendickson,* 498 S.W.2d 593 (Mo.App.1973).

## VI

Defendant's final point challenges the admission of fingerprint testimony. The State's fingerprint expert[7] testified that a thumbprint lifted from the Pontiac after the car had been abandoned belonged to the defendant. Defendant's counsel asked the witness if it were possible to determine how long the print had been on the car. The response was that it would be difficult to determine, but he could give "an educated guess." Defendant complains that the witness' testimony that the print was "fresh"—from two to twenty-four hours—did not have proper foundation. However, the following colloquy between defendant's counsel and the witness remedies any defect that might have existed regarding the testimony as to the fingerprint:

"Q (Mr. Anzalone) As an expert in a case like this, you can give a scientific opinion as to how long a print has been on a window; can you, sir?

A I cannot give a scientific time element, like minute or seconds, something of that nature. I can give you a scientific opinion whether the print was fresh or old, based on the prints I have seen in the past of similar developments."

Although the witness in response to one question stated that he could give an "educated guess" on the subject, we must examine his testimony as a whole to determine whether the witness intended to express an opinion or a judgment rather than a mere guess. *Hinrichs v. Young,* 403 S.W.2d 642 (Mo.1966); *Denny v. Spot Martin, Inc.,* 328

witness had, in fact, extensive training in detection and comparison of fingerprints.

S.W.2d 399 (Mo.App.1959).[8] Although a mere guess would not constitute substantial evidence, *Denny v. Spot Martin, Inc.*, supra, the "[u]se of 'guess' is not necessarily destructive of a witness's testimony if it appears, for instance, from his whole testimony that the witness intended to express an opinion or judgment." *Hinrichs v. Young*, supra at 646. An examination of the witness' testimony, reveals that the witness was expressing an opinion based on his knowledge as an expert, and his testimony was therefore admissible.

■ The defendant further alleges that no foundation was laid concerning the fingerprint testimony. He cites a Nevada case in which it was held that in order for an expert to testify as to when fingerprints were placed on a surface, a "control" test is required. *Beasley v. State*, 81 Nev. 431, 404 P.2d 911 (1965). "In a 'control test' a series of latent fingerprints are placed on a surface and controls are placed on all governing factors such as air, humidity, dust, and heat in order to determine how long the prints would remain on a given surface and could be dusted out." *Id.* at 404 P.2d 911, 914. Even if we were bound by the Nevada decision, it is distinguishable. In that case the expert was to "positively" testify as to the exact time the fingerprint was placed. The witness here made no attempt to give such a definite answer, but rather gave a broader period of time in which the prints were most likely made. Thus no control test would be necessary. This is so especially in the light of the fact that the witness testified that he was basing his answer on what he had seen in similar cases and the fact that it was stipulated that he was a fingerprint expert.[9] We hold that no error was committed by allowing the witness' answer as to the length of time the fingerprint had been on the Pontiac.

Since we find no reversible error, we affirm the defendant's conviction.

SIMEONE, P. J., concurs.

McMILLIAN, J., dissents in separate opinion.

McMILLIAN, Judge (dissenting).

I respectfully dissent. In my opinion, while New York law noted in footnote two of the majority opinion is persuasive, it is not binding where the Missouri Supreme Court has spoken on the same issue. Here, it is apparent, for whatever reason given by the majority opinion, that the second indictment was still viable at the time trial was had upon the first indictment. Consequently, in my opinion this case is controlled by *State v. Mayer*, 209 Mo. 391, 107 S.W. 1085 (1908). Therefore, I would reverse the judgment of conviction and remand for a new trial.

---

8. Although the cases cited are civil cases, "[t]he rules governing opinion and expert testimony are the same in criminal cases as in civil." *State v. Maxie*, 513 S.W.2d 338, 344 (Mo.1974).

9. The witness did relate in considerable detail his training and the methods used for lifting and comparing fingerprints.